## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| SPIRE STL PIPELINE LLC, | ) |
| | ) Cons. Case No: 4:18-CV-01327 |
| Plaintiff, | ) |
| | ) THIS DOCUMENT APPLIES |
| v. | ) TO CASE:  (4:18-CV-01344) |
| | ) |
| 3.31 ACRES OF LAND, MORE OR LESS, | ) Tract No. MO-SC-312.000 |
| SITUATED IN ST. CHARLES COUNTY, | ) |
| STATE OF MISSOURI et al; | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE THE REPORTS AND TESTIMONY OF GERALD BERNING, DONNA HOWARD AND WILLIAMS ONTIVEROS, AND COST TO CURE AND ALLEGED CROP LOSS DAMAGES

Plaintiff Spire STL Pipeline LLC ("Spire"), by counsel, submits this Memorandum in Support of its Motion to Exclude the Reports and Testimony of Mr. Gerald Berning and Ms. Donna Howard and Defendant's cost to cure and crop loss damages.

## BACKGROUND

On August 16, 2018, Spire commenced a series of condemnation actions under the Natural Gas Act, 15 U.S.C. § 717 *et seq.* ("NGA") to acquire permanent and temporary easements on portions of property in Missouri and Illinois in order to construct a new 65-mile interstate natural gas pipeline.[1]  A portion of the property Spire sought to condemn included property owned by Defendant located in northern St. Charles County, Missouri (the "Schaeffer parcel"), which is comprised of 135 acres of improved land utilized for agricultural purposes.

---

[1] The Missouri cases were later consolidated on September 10, 2018 in *Spire STL Pipeline LLC v. 3.31 Acres of Land et seq.*, 4:18-CV-1327 (E.D. Mo.) (Doc. # 14).

In order to construct the pipeline on the Schaeffer parcel, Spire required a 50-foot-wide permanent easement encompassing 1.670 acres, and additional temporary workspace easements totaling 2.18 acres that are limited in duration.

On December 12, 2018, the Court entered an order in the consolidated cases granting Spire immediate possession of the easements to begin construction, including the easements on the Schaeffer parcel. *See* Doc. # 235. All issues relating to immediate possession have been resolved by orders of the Court, construction is complete on the Schaeffer parcel, and the only remaining issue is limited to the amount of compensation due for the taking.

Spire now moves to exclude the reports and testimony of Defendant's experts Mr. Berning, Ms. Howard and Mr. Ontiveros, and Defendant's cost to cure damages and future crop loss claims.

## STANDARD OF REVIEW

"An intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge." Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules. But not all specialized knowledge can claim the label of reliable science. So, trial courts must guard against "expertise that is *fausse* and science that is junky." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 159, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (Scalia, J., concurring). And for more than twenty-five years, federal courts have looked to the familiar framework of Federal Rule of Evidence 702 to fulfill their "responsibility of acting as gatekeepers to exclude unreliable expert testimony." Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

"To be admissible, the proponent of the evidence must prove that the expert testimony is both reliable and helpful, and that the expert is qualified to be a witness." *Bavlsik v. GM LLC*,

2015 U.S. Dist. LEXIS 108614, *2 (E.D. Mo. Aug. 18, 2015) (citing Fed. R. Evid. 104(a) and Fed. R. Evid. 702 advisory committee's note).  The proponent carries the burden of proving the expert is qualified and testimony is both reliable and helpful by a preponderance of the evidence.  *See Bourjaily v. United States*, 483 U.S. 171, 176, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987); *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).

Under Eighth Circuit law, **district courts have considerable discretion in excluding expert testimony**. *Ackerman v. U-Park, Inc.*, 951 F.3d 929, 1000 (8th Cir. 2020); *Anderson v. Raymond Corp.*, 340 F.3d 520, 523 (8th Cir. 2003).

An expert opinion is admissible if (1) "the testimony is based upon sufficient facts or data,' (2) 'the testimony is the product of reliable principles and methods,' and (3) 'the expert has reliably applied the principles and methods to the facts of the case.'" *Ackerman*, 951 F.3d at 932 (quoting Fed. R. Evid. 702).  "When determining the reliability of an expert's opinion, a court examines the following four non-exclusive factors: (1) whether the expert's theory or technique 'can be (and has been) tested,' (2) 'whether the theory or technique has been subjected to peer review and publication,' (3) 'the known or potential rate of error,' and (4) 'general acceptance.'" *Id.* (quoting *Daubert*, 509 U.S. at 593-94).

As with all evidence, expert testimony must also satisfy the requirements of Fed. R. Evid. 403. Specifically, district courts must exclude evidence "if its probative value is substantially outweighed by . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Expert testimony that would confuse or mislead the jury should be excluded.  *Holloway v. Ameristar Casino St. Charles, Inc.*, 2009 U.S. Dist. LEXIS 118349, *20 (E.D. Mo. 2009) (citing *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1060 (8th Cir. 2005)).

3

## THE NATURAL GAS ACT AND SPIRE'S OBLIGATIONS UNDER THE FERC CERTIFICATE

**A.      Statutes And Regulations Governing Natural Gas Pipelines.**

In 1977, in response to the 1973 oil crisis in the United States, Congress created the Federal Energy Regulatory Commission ("FERC"). 42 U.S.C. § 7171. FERC took over responsibility for determining the public necessity for development of natural gas pipelines. *Id.* § 7172. Under the NGA, companies proposing to construct a pipeline must obtain a certificate of public convenience and necessity from FERC—known as a "FERC Certificate."  15 U.S.C. § 717f(c).

The executive branch controls the issuance of certificates through "extensive regulations" that FERC has promulgated.  *ANR Pipeline Co. v. Schneidewind*, 801 F.2d 228, 234 (6th Cir. 1986).  The process begins with an application from the natural gas company that includes: "(1) a description of the proposed pipeline project, (2) a statement of the facts showing why the project is required, and (3) the estimated beginning and completion date for the project." *E. Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808, 818 (4th Cir. 2004) (citing 15 U.S.C. § 717f(d) and 18 C.F.R. § 157.6(b)).  FERC files a notice of the application in the *Federal Register*, public comment and protest are allowed, and FERC conducts a public hearing on the application.  *Id.* (Citing 18 C.F.R. § 157.9-157.11).

As part of this evaluation, FERC must investigate the environmental consequences of the proposal.  *Id.*  At the end of the process, FERC issues a certificate if it finds that the proposed pipeline "is or will be required by the present or future public convenience and necessity." *Id.* (quoting 15 U.S.C. § 717f(e)). The certificate specifies a date for the completion of construction

4

and the start of service. *Id.* (citing 18 C.F.R. § 157.20(b)).  It may also include any terms and conditions that FERC deems "required by the public convenience and necessity." *Id.*

Once FERC issues a certificate, the certificate holder has "the right of eminent domain" over any lands needed for construction of the pipeline. 15 U.S.C. § 717f(h). Certificate holders may acquire both "the necessary right-of-way" as well as "the necessary land" to construct and maintain the pipeline. *Id.*

**B.      Spire's FERC Certificate**

On January 26, 2017, Spire filed an application pursuant to section 7(c) of the NGA, requesting authorization to construct and operate a new, 65-mile-long interstate natural gas pipeline system, extending from Scott County, Illinois, to St. Louis County, Missouri for the purpose of providing access to reasonably-priced natural gas for residents and businesses (the "Project"). *See* **Exhibit 1** (FERC Certificate), ¶ 1.  To construct the pipeline, it was necessary for Spire to traverse portions of agricultural land in Illinois and Missouri, which included hayfields, pastures and crop production land (for corn and soybeans, generally). *Id.* at ¶ 117.

FERC began its environmental review of the Project.  *Id.* at ¶ 200.  As part of that process, and to satisfy the requirements of the National Environmental Policy Act ("NEPA") of 1969, 42 U.S.C. § 4321 *et seq.*, FERC staff prepared an Environmental Assessment ("EA")[2] for the Project after providing for notice and a period for public comment.  *Id.* at ¶¶ 201-206.

---

[2] The EA was produced by Defendant in discovery, bates labeled SCHAEFFER 000525-000994. The EA is comprised of 470 pages.  The EA is a document created and maintained by an agency of the United States and is of public record.   Due to the size of the document, Spire directs this Court to a true and correct electronic copy of the EA, available on FERC's website at: *https://elibrary.ferc.gov/idmws/search/fercadvsearch.asp* (last visited June 22, 2020). The EA was issued on September 29, 2017 in docket CP17-40.

5

The EA encompassed standards related to "geology, soils, water resources, wetlands, vegetation, fisheries, wildlife, threatened and endangered species, land use, recreation, visual resources, socioeconomics, cultural resources, air quality, noise, safety, cumulative impacts, and alternatives." *Id.* at ¶ 203. In addition, the EA analyzed "the anticipated level of impact on all applicable resources and discusses Spire's commitment to implement specific mitigation measures to reduce such impacts. Those mitigation measures include adoption, with specific deviations, of [FERC's] guidelines as outlined in [the] *Upland Erosion Control, Revegetation, and Maintenance Plan* ("Plan")[3] and *Wetland and Waterbody Construction and Mitigation Procedures* ("Procedures"), as well as additional construction, restoration, and mitigation plans prepared specifically for the project." *Id.* at ¶ 241.

On August 3, 2018, FERC issued a Certificate of Public Convenience and Necessity ("Certificate") authorizing Spire to proceed with the Project, conditioned on, among other things, Spire's compliance with FERC Environmental Condition Nos. 1 through 22 identified in the Certificate. *See id.* at pp. 82-83. FERC further required Spire to follow the construction procedures and mitigation measures described in Spire's application and the EA. *Id.* at p. 95, Appendix, ¶ 1. FERC also required Spire to file its Implementation Plan outlining Spire's procedures to ensure compliance with the environmental conditions prescribed in the FERC Certificate. *Id.* at p. 95, Appendix, ¶ 6.[4]

---

[3] The Plan was produced by Defendant in discovery, bates labeled SCHAEFFER 000483-000502. The Plan is a document created and maintained by an agency of the United States and is of public record. To minimize the number of exhibits to this Motion, Spire respectfully directs this Court to a true and correct electronic copy of the Plan, available on FERC's website at: *www.ferc.gov/industries/gas/enviro/plan.pdf* (last visited June 22, 2020).

[4] The Implementation Plan was produced by Defendant in discovery, bates labeled SCHAEFFER 002351-003541. A true and correct electronic copy of the Implementation Plan is available at: *https://www.spireenergy.com/sites/default/files/2018-12/8-13-18%20Spire%20STL_Implementation%20Plan_8.13.18.pdf* (last visited June 22, 2020).

Based on the environmental mitigation measures recommended by the EA and Spire's application, FERC determined that an environmental impact statement ("EIS") for the Project was not required.  *Id.* at ¶ 239.  Specifically, under the NEPA, "agencies must prepare an EIS for major federal actions that may *significantly impact the environment*."  *Id.* at ¶ 238 (emphasis supplied).  "However, if an agency determines that a federal action is not likely to have significant adverse effects, it may rely on an EA for compliance with NEPA."  *Id.*  FERC found that the "EA for the Spire STL Pipeline Project appropriately considers and discloses the environmental impacts of the project, and *supports a finding of no significant impact*."  *Id.* at ¶ 239 (emphasis supplied). Therefore, FERC concluded "that the potential environmental impacts of the Spire STL Pipeline Project do not rise to a level of significance that would require preparation of an EIS" and affirmed the "EA was appropriate in this case."  *Id.* at ¶ 242.

1.      **In-Service Authorization**

FERC Commissioners delegated authority to its Director, Office of Energy Projects ("OPE") to monitor Spire's compliance with the environmental conditions.  Prior to the commencement of construction, FERC's OEP Director issued authorization to proceed with construction after Spire demonstrated its compliance with the prerequisite conditions up until that point.  Spire then filed weekly environmental update reports, as required, that summarized construction activity and environmental impacts, including remediation as necessary. Prior to placing the mainline facilities in to service, FERC required Spire to obtain written authorization from the OEP.  **Exhibit 1**, Appendix (Environmental Condition No. 10) at p. 95.  FERC affirmed that such an "authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the project are proceeding satisfactorily."  *Id.*

7

On November 8, 2019, Spire submitted a request to OEP to place the Project into service. *See* **Exhibit 2.** In accordance with FERC's environmental conditions, Spire reiterated to FERC that it "is committed to continuing to monitor restoration and revegetation along the rights-of-way, and address landowner concerns." *Id.* at p. 2.  On November 14, 2019, FERC issued an order granting Spire's request. *See* **Exhibit 3**. FERC expressly determined that "restoration is proceeding satisfactorily" and that "Spire is required to monitor restoration and revegetation along the right-of-way and address landowner concerns." *Id.*  FERC reiterated its position that it "will continue to monitor and inspect the project right-of-way to ensure that Spire follows through with its obligation and to ensure that restoration and revegetation is successful." *Id.*

## II.       Post-Construction Monitoring

Regarding post-construction monitoring, Spire must "document restoration and revegetation of the right-of-way and other disturbed areas."  EA, Section A.8.4.  Spire *must* also "monitor upland areas after the first *and second* growing seasons following restoration *or until revegetation is successful in accordance with the Plan*" and to "file quarterly monitoring reports with the FERC to document the status of revegetation in disturbed areas." (Emphasis added). *Id.*  In addition, Spire must coordinate "with landowners on the location of drain tiles or irrigation systems within the right-of-way. If drain tiles or irrigation systems are damaged, cut, or removed during construction," Spire agreed to "work with the landowner to replace them or repair the damaged portion." EA, Section B.5.1.

Similarly, Spire *must* "visually inspect agricultural land to ensure that crop vigor in areas affected by construction is similar to adjacent portions of the same field, or as otherwise agreed to by the landowner." *Id.* FERC's environmental staff determined the "impacts on agricultural land" due to the Project "would be *temporary and not significant*" based on Spire's obligations

8

to monitor and maintain agricultural land and crop productivity following installation of the pipeline. *Id.* (Emphasis supplied).

The Plan similarly outlines procedures for restoration and post-construction monitoring, maintenance and reporting. *See* Plan, Sections V and VII.[5] With regard to restoration, the Plan requires spire to engage in cleanup operations, erosion control, soil compaction mitigation, and revegetation. Plan, Section V.A-D, pp. 12-16.

Regarding monitoring revegetation, the Plan requires Spire to "conduct follow-up inspections of all disturbed areas, as necessary, to determine the success of revegetation and address landowner concerns. ***At a minimum, conduct inspections after the first and second growing seasons***." Plan, Section VII.A.1 (emphasis supplied). The Plan directs Spire to "[c]ontinue revegetation efforts until revegetation is successful." Plan, Section VII.A.2.

With regard to drainage, the Plan provides that Spire must "[m]onitor and correct problems with drainage and irrigation systems resulting from pipeline construction in agricultural areas until restoration is successful." Plan, Section VII.A.3. The Plan explains "[r]estoration shall be considered successful if the right-of-way surface condition is similar to adjacent undisturbed lands, construction debris is removed, . . . revegetation is successful, and proper drainage has been restored." Plan, Section VII.A.4.

As to Spire's reporting requirements, the Plan directs Spire to file with FERC "quarterly activity reports documenting the results of follow-up inspections" and "any problem areas, including those identified by the landowner; and corrective actions taken for at least 2 years following construction." Plan, Section VII.B.1-2.

---

[5] The EA incorporates by reference the Plan and Procedures. *See* EA, Section A.8.

<u>ARGUMENT</u>

D.     **This Court Should Exclude The Reports And Testimony Of Mr. Berning And Ms. Howard Regarding Soil Damage And Alleged Damage To The Remainder Because Spire Has A Continuing Obligation To Address And Resolve These Issues Under The FERC Certificate And The Opinion Testimony Of These Experts Will Not Help The Commission To Determine A Fact In Issue.**

To determine whether an expert's testimony "fits" the proceedings, this Court asks whether it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Thus, even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*. That is, "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591.

In Missouri, a landowner is entitled to "just compensation" for the property taken, equal to the "fair market value of the property at the time of the taking" (also known as the "before and after" rule). *St. Louis City v. Union Quarry & Constr. Co.*, 394 S.W.2d 300, 305 (Mo. 1965); *Citizens Electric Corp. v. Amberger*, 591 S.W.2d 736, 738 (Mo. App. E.D. 1979).

Where there is a partial taking, such as here, "the measure of just compensation is the difference between the fair market value of the landowners' property immediately before and immediately after the taking." *Citizens Electric*, 591 S.W.2d at 738; *see also* Mo.Rev.Stat. § 523.001(1) ("If less than the entire property is taken, fair market value shall mean the difference between the fair market value of the entire property immediately prior to the taking and the fair market value of the remaining or burdened property immediately after the taking."). "The

question of damages is not referable to the time of trial nor to the time of the construction of the project but to the time of appropriation." *Citizens Electric*, 591 S.W.2d at 739.

If construction is complete at the time of trial, "actual damage to the right-of-way during construction can be shown as evidence to the extent of the burden cast upon the land at the time of the appropriation except for tortious actions which could not have been reasonably anticipated." *Id.* at 740 (citing *Kamo Electric Cooperative v. Baker*, 287 S.W.2d 858, 861-62 (Mo. 1956)). Thus, "[t]o prove damages which 'will' result to the remaining land from the temporary use, the owner must show a *direct evidentiary nexus* between construction damages and 'the extent of the burden cast upon the land *at the time of the appropriation*, provided that the acts were not tortious and the damage could have been *reasonably anticipated*.'" *State ex rel. Mo. Highway Transp. Comm'n v Beseda*, 892 S.W.2d 740, 741 (Mo. App. E.D. 1994) (quoting *KAMO Electric Coop.*, 287 S.W.2d at 862)) (emphasis supplied in part); *see also Wood River Pipeline Co. v. Sommer*, 757 S.W.2d 265, 267-68 (Mo. App. E.D. 1988) (explaining "[a]ny risk that may result from the taking must be shown to be *reasonably probable* before they can be considered as proper elements in computing the diminution in value of the remainder.") (Emphasis supplied).

As far as Spire can discern, no Missouri case has dealt with a condemnation proceeding where the scope of the condemnor's authority to condemn and post-construction monitoring obligations were governed by FERC. In *Citizens Electric*, for example, the utility company had finished construction of the right-of-way at the time of trial and did not have an obligation to monitor the area following construction or to cure any identifiable defects within the right-of-way caused by the construction of the utility line. *Citizens Electric*, 591 S.W.2d at 740. Thus, evidence that the landowner sustained actual damage to the right-of-way during construction (i.e., soil compaction) was admissible at the time of trial. *Id.*

11

Spire has an ongoing obligation to monitor the right-of-way in accordance with the FERC Certificate, *see* Section B.II., *supra*, and evidence of alleged damages caused by the construction of the pipeline are not certain or quantifiable. There is no way to know whether the damage to the right-of-way alleged by Defendant will adversely affect the market value of the property. This is why the District Court for the Northern District of Ohio excluded the landowners' expert's report and testimony relating to nearly identical issues in *Rover Pipeline, LLC v. 10.055 Acres of Land*, 2018 U.S. Dist. LEXIS 217574 (Case No. 5:17-CV-239) (N.D. Ohio Dec. 28, 2018). *Rover* involved a condemnation proceeding filed under the NGA to construct and operate a natural gas pipeline. FERC issued a certificate in *Rover* authorizing the construction and required the pipeline company to monitor the agricultural land disturbed by construction to ensure revegetation of the crop fields. *Id.* at *18. The district court discussed at length the pipeline company's obligations under the post-construction monitoring program in *Rover*, which resemble Spire's obligations in this case. *See id.* at 18-23.[6]

In *Rover*, the landowners retained a soil expert to test soil on the subject parcel. The expert extracted soil samples from the property and concluded the pipeline company's construction activities caused "serious compaction" of the soil. *Id.* at *24-25. However, the district court explained "[t]he only issue before this Court is the 'just compensation' that is owed to the landowners" for any diminution in the fair market value of the property. *Id.* The district court rejected the landowners' soil compaction theory because "Rover's post-

---

[6] In *Rover*, however, FERC required the construction and post-construction of the project to be governed by a "Final Environmental Impact Statement". *Id.* at *16. Here, FERC found the environmental impacts of the project were minimal and that an impact statement was not required. Therefore, FERC determined that the EA was sufficient regarding construction and post-construction monitoring.

construction mitigation measures" included "decompaction of the soil," and there was "no way to know at this time if those measures will be ineffective." *Id.* Indeed, the district court expressly noted that the soil expert conceded at deposition "that decompaction might be possible." *Id.* The district court explained that "[u]ntil such time that the results of these measures can be evaluated, *there is no way to determine whether compaction of the soil will adversely affect the market value of the property.*" *Id.* (emphasis supplied). "Indeed, until future crop yields can be measured, *it is unknown whether these measures will even be necessary.*" *Id.* at fn. 8 (emphasis supplied). The district court, therefore, excluded the report and testimony of the soils expert because "information and expert testimony on the current compaction of the soil will not aid the jury in their determination of just compensation[.]" *Id.* (citing Fed. R. Evid. 702).

     1.    **Mr. Berning.**

Mr. Berning, like the expert in *Rover*, concludes Spire's construction of the pipeline has impacted soil depth, compaction and drainage within the right-of-way on the Schaeffer parcel.[7] **Exhibit 4**, p. 3-6 (bates SCHAEFFER 001266-1269). Mr. Berning concludes if remediation does not occur within the right-of-way, "there will be a significant decrease in the productivity of the impacted soils. The reduced thickness of the topsoil, the deeply compacted soil and the additional wetness in some of the soils will *likely* impact how this field is managed for the production of commodity crops for many years." *Id.* (Emphasis supplied).

Mr. Berning's conclusions are premised on the assumption that Spire's restoration efforts on the Schaeffer parcel are "100 percent complete." *See* **Exhibit 4**, p.1; *see also* **Exhibit 5** (Berning

---

[7] Mr. Berning produced a report on February 24, 2020 and a supplemental report in March 2020. These reports are attached hereto as **Exhibit 4 and 4-A** respectively.

Depo.), page 9:line 19 to page 11:line 11.[8]  To support this assumption, Mr. Berning relies on a status report Spire submitted to FERC on January 7, 2020, Status Report No. 65, in which Spire stated restoration efforts were complete project wide. **Exhibit 6**, p. 5 (under "GENERAL PROJECT UPDATEDS"). This status report, however, was referring to restoration during construction, not after construction.[9]  Specifically, unbeknownst to Mr. Berning, Spire submitted another status report to FERC on March 13, 2020, Status Report No. 68, as required by the Certificate, explaining "Restoration status during construction and as reported in previously filed construction status reports refers to the *completion of final grade, contours returned to pre-existing conditions (or new contours as otherwise approved), replacement of previously segregated topsoil, and the application of seed and mulch, if necessary, to the right-of-way workspaces*." **Exhibit 7** (Status Report No. 68) (emphasis supplied).

Spire further explained that it agreed, in accordance with the Plan, to monitor "*restoration and revegetation for post-construction issues, reporting any issues identified, and correcting these issues during the post-construction phase of the project*." *Id.*  Indeed, Spire's corporate representative affirmed at deposition that Spire will, in accordance with the Certificate, continue to monitor restoration and revegetation within the right-of-way for post-construction issues for the "life of the asset."  **Exhibit 8** (D. Sipe Depo.), 79:20 to 80:13, 82:2-20, 92:6 to 93:24.  If a landowner reports a condition within the right-of-way to Spire, Spire will investigate the condition and cure any identifiable defects caused by the installation of the pipeline. **Exhibit 9** (R. English Depo.), 30:13 to 31:4, 35:5-14, 36:21 to 37:3.  Mr. Berning's conclusions are therefore premised on an incorrect assumption.

---

[8] All further citations to deposition testimony are in the following short-form unless otherwise noted: "[page]:[line]-[line]".

[9] Regardless of what is contained in the status report filed January 7, 2020, this does not vitiate Spire's obligation pursuant to the EA and Plan to restore and continue to monitor the right-of-way.

Mr. Berning, like the expert in *Rover*, admitted additional work by Spire within the right-of-way would affect the findings contained in his soil report: "Anything they do to deal with those issues of -- of soil -- I mean topsoil depth and drainage and compaction would certainly affect the project, yes, and *my report, yeah. It would change it probably. Yeah.*" **Exhibit 5** (Berning Depo.), 15:1-5 (emphasis supplied). *Mr. Berning conceded all conclusions in his report could change due to additional restoration within the right-of-way.* *See* **Exhibit 5**, 123:2-16 (conclusion number one); 123:17 to 124:6 (conclusion number two); 90:21 to 91:7, 93:9-18 and 124:7-24 (conclusion number three); 124:25 to 125:7 (conclusion number four); and 125:8-20 (conclusion number five).

There is no way to determine *at this time* whether issues with soil depth, compaction and drainage, if any, will adversely affect the market value of the property because Spire is obligated under the Certificate to monitor restoration and revegetation of the right-of-way, report to FERC and correct any identifiable issues during the post-construction phase of the Project. *See* Section B.II, *supra*. Further, if Spire should fail to comply with the conditions of the Certificate down the road, this Court has jurisdiction under 15 U.S.C. § 717u to enforce them.[10][11] But, unless and until that happens, this Court's jurisdiction is limited to the single, narrow issue of just compensation, which does not include speculative soil damages and future speculative crop loss claims. While Mr. Berning's report may be based, to some degree, on scientific evidence—*but see also* Section E, *infra*—his conclusions are not reasonably probable but rather are

---

[10] FERC also has authority to force Spire to comply with its FERC Certificate, including imposing civil penalties and revocation of authority. *See* 15 U.S.C. § 717.

[11] This Court does not have jurisdiction, however, to reconsider or modify issues within the scope of the FERC Certificate. *See Am. Energy Corp. v. Rockies Express Pipeline LLC*, 622 F.3d 602, 605 (6th Cir. 2010)("Exclusive means exclusive, and the Natural Gas Act nowhere permits an aggrieved party otherwise to pursue collateral review of a FERC certificate in state court or federal district court.").

based on pure speculation and conjecture at this time.  Mr. Berning's reports and testimony do not "fit" these proceedings, *Daubert*, 509 U.S. at 591, because they will not "help the trier of fact . . . to determine a fact in issue." *Rover*, at 24 (citing Fed. R. Evid. 702). Mr. Berning's reports and testimony do nothing more than confuse the core issues before the Commission in this proceeding.  Fed. R. Evid. 403.

2.    **Ms. Howard**

Ms. Howard estimated the market value of the Schaeffer parcel before the imposition of the permanent easement to be $1,337,000.  *See* **Exhibit 10**, p. 20.[12]  After the imposition of the permanent easement, Ms. Howard concludes the market value of the Schaeffer parcel was reduced to $1,057,000, a difference of $280,000.  *See id.*

Ms. Howard claims the right-of-way and southern portion of the Schaffer parcel beyond the right-of-way are now considered "poor" farmland as a result of the pipeline.[13]  Ms. Howard believes that "after the construction of the pipeline, the topography of the remainder has been impacted. She also believes that a drainage ditch that crosses the pipeline had been blocked by the pipeline construction which purportedly resulted in ponding on both sides of the permanent easement. She claims that this is more significant along the southern boundary of the pipeline as the natural water flow of the drainage ditch was from south to north. Furthermore, the area included in the permanent easement and temporary easement area have lost topsoil and

---

[12] Spire's citations to the Ms. Howard's Report are to the page numbers identified on the top right corner of the document.

[13] Ms. Howard divided the Schaeffer parcel into "northern" and "southern" sections with the permanent easement dividing the sections. *Id.* at pp. 19-20. The northern section is comprised of 23.2 acres, valued at $10,000 per acre.  The southern section is comprised of 106.33 acres, valued at $7,700 per acre.  *See id.*  Ms. Howard concludes the damage caused by the construction of the pipeline reduced the value of the southern portion of the Schaeffer parcel by twenty-three (23%) percent (or $2,300.00 per acre).  *Id.* at p. 19.

currently have sub-soil mixed in with the topsoil in this area." *Id.* at p. 19 (citing to Mr. Berning's report).

Ms. Howard, like Mr. Berning, assumes Spire's monitoring, restoration and revegetation work is complete. **Exhibit 11** (Howard Depo.), 64:6-14. However, Ms. Howard, like Mr. Berning and the expert in *Rover*, conceded her conclusions would change based on Spire's ongoing restoration obligation during the post-construction phase of the Project. *Id.* at 56:11 to 58:25. Thus, there is no way to determine whether the southern portion of the Schaeffer parcel is truly "poor" farmland at this time.[14] Ms. Howard's conclusions relating to right-of-way and southern portion of the Schaeffer parcel beyond the right-of-way are premature and speculative and, like Mr. Berning, will not "help the trier of fact . . . to determine a fact in issue." Fed. R. Evid. 702; Fed. R. Evid. 403.

**E.    Mr. Berning's Compaction Results Are Not Scientifically Valid And Fail To Satisfy FED. R. EVID. 702 And The *Daubert* Framework, Rendering The Conclusion Unreliable.**

In addition to the reasons set forth in Section D, *supra*, Mr. Berning's conclusion that the soil is compacted within the right-of-way should be excluded because the results were based on faulty testing, rendering the conclusion unreliable.

"When faced with a proffer of expert scientific testimony, the trial court must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue.'" *Polski v. Quigley Corp.*, 538 F.3d 836, 838 (8th Cir. 2008) (quoting *Daubert*, 509 U.S. at 592-93). "As the gatekeeper, the district court's role is to discern 'expert opinion evidence

---

[14] As noted in Section F, *infra*, Defendant's tenant farmer, Mr. Simon, testified he considers the Schaeffer parcel to be "prime" farmland before ***and after*** the installation of the pipeline, ***including all areas inside and outside the right-of-way.*** **Exhibit 13** (Simon Depo.), 60:11-15, 134:7 to 135:11.

based on 'good grounds' from subjective speculation that masquerades as scientific knowledge.'"
*Id.* (quoting *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001)).

     Mr. Berning's report contains information derived from test pits located inside and outside the right-of-way with corresponding photographs depicting each site. Below each picture is a description of the compaction level. **Exhibit 4** (Berning report), pp. SCHAEFFER 001273-001300; **Exhibit 5** (Berning Depo.), 77:13-23. Test pit numbers 2-3, 6-7, 10-11, 14-15, 18-19, 22-23 and 26-27 are located inside the right-of-way. **Exhibit 4** (Berning report), pp. SCHAEFFER 001273.

     Mr. Berning testified at deposition he tested soil compaction through *visual observation only, not by any scientific test*. **Exhibit 5** (Berning Depo.), 80:1-6 ("That's my--that's my *field interpretation*, David.") (emphasis supplied). The following colloquy occurred at deposition:

> Q.    *Okay. Is there -- is there a way to use an instrument and create data to support the conclusions that the soil is either friable or compacted, **or is it just a -- a feel?***
>
> A.    ***This is a feel.*** *The **only way to corroborate** that would be pull a sample of known -- of known quantity. For example, often I pull samples that have a 50 CC that I know -- I know the sample size, 50 CC. And I send it to the lab, and I'll get grams per cubic centimeter. And then I --then I can make a correlation, if it's over 1.6 or is it over 2 and a half. And -- but -- but just in the field, these are just -- **this is just how we describe things in the field by feel and look, and it's just a feel determination**.*

**Exhibit 5** (Berning Depo.), 80:7-21 (emphasis supplied).

     Mr. Berning conceded the only way to "corroborate" compaction levels would be to *scientifically* test the soil. *See id.* He did not do so. Rather, Mr. Berning admitted the field was too wet to conduct *any* scientific testing to verify the level of compaction. **Exhibit 5** (Berning Depo.), 80:22 to 81:11. He explained you could "hardly hold [the soil] in your hand. *No way could you get a sample when we were there, an accurate sample. It would have been inaccurate*. There's just no way to have done that at that -- with that moisture content at that

time." *Id.* at 81:6-11 (emphasis supplied).  *That was true for all 28 test pit sites, inside and outside the right-of-way.* *Id.* at 81:14-17.

"A court should not admit opinion evidence that 'is connected to existing data only by the *ipse dixit* of the expert.'" *JFM Mkt. Corp. v. SuperValu, Inc.*, 946 F.3d 995, 1000 (8th Cir. 2019) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)).  Rather, as the gatekeeper, the district court's role is to discern "expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Glastetter*, 252 F.3d at 989 (8th Cir. 2001).

Mr. Berning has failed to identify how visual observation *alone* is a scientifically valid and a generally accepted standard within the scientific community for testing soil compaction. *He all but conceded it is not*. His compaction theory was generated for purposes of litigation only, and the analytical gap between Mr. Berning's "data" and the conclusions reached is far too great to be reliable. Simply put, there is no scientific data to support the conclusion that the soil is compacted on the Schaeffer parcel, rendering Mr. Berning's compaction theory inadmissible. *See e.g., Glastetter*, 252 F.3d at 989-990 (affirming the district court's exclusion of the expert's opinion on causation because the data and methods of the expert were not scientifically valid).

F.      **Ms. Howard's Conclusion That The Schaeffer Parcel Was "Average" Farmland Prior To The Pipeline And Was Reduced To "Poor" Farmland After The Pipeline Is Based On Insufficient Facts Or Data And Is Not Reliable Under The *Daubert* Framework.**

1.      **Ms. Howard's conclusion that the Schaeffer parcel was "average" farmland prior to the pipeline.**

Ms. Howard concludes the Schaeffer parcel was considered "average" farmland <u>prior</u> to the installation of the pipeline based on the property's characteristics, which primarily includes soil quality, compaction, drainage and access.  **Exhibit 11** (Howard Depo.), 24:7 to 25:25, 33:9-25. This conclusion is based on information contained in Mr. Berning's report (including the "soil

19

survey" contained in the report), the declaration of Mr. Simon, soil maps, and her experience appraising agricultural property. *Id.* at 17:10 to 18:24.

A.     **Ms. Howard is not qualified to opine on the relative quality of the Schaeffer parcel prior to the pipeline.**

Before an expert can offer an opinion at trial, the Court must decide whether the expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case. *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001). That is, Fed. R. Evid. 702 requires that "the area of the witness's competence [match] the subject matter of the witness's testimony." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006).

Ms. Howard has some experience appraising agricultural property for "bank financing" or "estate planning" purposes or cases involving sewer easements, **Exhibit 11**, 79:21 to 80:12, but this is the first agricultural property she appraised in St. Charles County encumbered by a pipeline. *Id.* at 79:9-20. In addition, she is not a farmer, soil scientist or agronomist and has no experience analyzing soil chemistry or nutrients. **Exhibit 10**; **Exhibit 11**, 60:4-10.

Ms. Howard has not sufficiently explained how her very general, nonspecialized experience appraising agricultural property "leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 Advisory Committee note (2000 amend). Mr. Simon—a person who has farmed property in the general area for decades—on the other hand, considers the Schaeffer parcel to be "prime" farmland before ***and after*** the pipeline. **Exhibit 12** (declaration), ¶ 3; *see also* **Exhibit 13** (Simon Depo.), 59:15 to 60:10-15, 134:7 to 135:11. Regardless, whether the farmland

was good, average or poor prior to the installation of the Project, Ms. Howard is not a person qualified to offer that testimony.

> B.  **Even assuming Ms. Howard is qualified to offer her conclusion, the conclusion is speculative, unsupported by sufficient data and contrary to the facts of the case.**

"If the expert evidence is speculative, unsupported by sufficient facts, or contrary to the facts of the case, the evidence is unreliable, and therefore inadmissible." *Holloway v. Ameristar Casino St. Charles, Inc.*, 2009 U.S. Dist. LEXIS 118349, *20 (E.D. Mo. 2009) (citing *United States v. Bailey*, 571 F.3d 791, 803 (8th Cir. 2009)).

Ms. Howard's conclusion is not based on any scientific data but rather pure speculation and conjuncture. For example, with regard to soil quality, Ms. Howard conceded nothing in Mr. Berning's report or the declaration of Mr. Simon discusses the relative quality of the soil as being good, average or poor prior to the pipeline. **Exhibit 11** (Howard Depo.), 23:15-19, 24:7-18. Ms. Howard simply reviewed these documents as "general background" and concluded the Schaeffer parcel was "average". This conclusion is also contradicted by Mr. Simon, who believes the farm is prime farmland both before and after installation of the pipeline.

In addition, although Ms. Howard claims she relied on certain "maps" that identify general soil characteristics in the area, she conceded the maps were not specific to the Schaeffer parcel and she could not recall any specific analytical data contained in the maps relating to the Schaeffer parcel. **Exhibit 11** (Howard Depo.), at 26:19 to 28:5, 68:9-15. Significantly, Mr. Berning explained in his report "***it would be inappropriate*** to use the soil profile descriptions" in these maps to determine pre-construction soil content. **Exhibit 4**, p. 1-2 (emphasis supplied). Ms. Howard merely concludes the soil quality "appeared to be average for the market" without any independently verifiable data to support that conclusion. **Exhibit 11**, 26:1-6, 28:10-16.

Similarly, regarding soil compaction Ms. Howard conceded nothing in either Mr. Berning's report or Mr. Simon's declaration discusses soil compaction levels as a basis to conclude whether the soil was good, average or poor prior to the pipeline. *Id.* at 23:15-19, 24:7-18. Ms. Howard has identified no additional information to support the conclusion concerning the compaction levels of the soil prior to the pipeline.

Ms. Howard also conceded there is nothing contained in Mr. Berning's report or Mr. Simon's declaration discussing pre-construction drainage sufficient to support a conclusion about the relative quality of the farmland as being good, average or poor prior to the pipeline. *Id.* at 23:15-19, 24:7-18. Rather, the only information contained in Mr. Simon's declaration is his statement that the farmland has "multiple drainage ditches." *Id.* at 24:13-16. This information, without more, fails to support Ms. Howard's conclusion about the quality of the farmland prior to the pipeline based on drainage

Finally, Ms. Howard conceded there was no issue with access as of the date of taking. **Exhibit 11**, 70:23 to 71:10. Indeed, Mr. Simon testified he has had no difficulty accessing the northern or southern portion of the Schaeffer parcel before or after installation of the pipeline. **Exhibit 13**, 21:21 to 22:6, 40:8-11. Thus, this conclusion is not supported by the facts.

Nothing in *Daubert* or the Federal Rules of Evidence "requires the district court to admit opinion evidence that is connected to existing data only by the *ipse dixi* of the expert." *Kumho Tire*, 526 U.S. at 157. Ms. Howard has no basis in fact to conclude what the quality of the Schaeffer parcel was before the installation of the pipeline. Rather, her conclusion is speculative, unsupported, and contrary to the facts of the case. Her conclusion is therefore unreliable and should be excluded. *See e.g., Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 720 (8th Cir. 2012)

(excluding expert testimony because it was excessively speculative and unsupported by sufficient facts).

> 2.    **Ms. Howard's conclusion that the Schaeffer parcel was reduced to "poor" farmland after the pipeline.**

After the installation of the pipeline, Ms. Howard concludes the 106 acres to the south of the easement was reduced to "poor" farmland, which has purportedly diminished the value of the Schaeffer parcel by twenty-three (23%) percent. **Exhibit 11**, 67:20-25. Ms. Howard claims the reduction is value is based "not necessarily [on] soil [quality], but the access [and] the drainage . . . ." *Id.* at 68:1-16.

Notwithstanding Ms. Howard's conclusion, Mr. Simon testified he considers the entire Schaeffer parcel, including the area within the right-of-way, to be prime farmland even after installation of the pipeline.  **Exhibit 13**, 60:11-15, 134:7 to 135:11.

Regardless, Ms. Howard is not qualified to render such a conclusion (for the same reasons stated in Section E.1.A., *supra*) and, more significantly, does not have a reasonable basis in fact to support the conclusion that the southern portion of the Schaeffer parcel has diminished in value.

First, Ms. Howard's conclusion of inadequate access, based solely on Mr. Simon's declaration, is contradicted by Mr. Simon's deposition testimony.  As noted, Mr. Simon testified he has always been able to access the northern and southern portions of the farm after installation of the pipeline in order to prepare the fields for the 2019 and 2020 growing seasons. Mr. Simon testified he can access both sections of the farm by the access road that enters the northern portion of the farm from Portage Road and exits the southern portion of the farm onto Highway 94, and he often accesses the farm from Portage Road or Highway 94 depending on which section of the property he is farming.   **Exhibit 13**, 21:21 to 23:22, 30:9 to 31:14, 34:21 to

35:3, 40:8-11, 70:8 to 71:10.  Mr. Simon testified there was one limited occasion in early 2019 where the access road was blocked during installation of the pipeline.  However, this did not impact his farming operations, and when Mr. Simon contacted Spire to access the grain stored on the southern portion of the property, Spire provided Mr. Simon access via the access road.  *Id.* at 38:6 to 39:7.

The only limitation on access identified by Mr. Simon is his own self-imposed limitation, claiming he is not permitted to cross the easement when engaging in farming operations and is required to go around the easement.  *Id.* at 32:5-23, 70:21 to 71:10.  However, this conclusion is based on Mr. Simon's incorrect assumption and, apparently, direction received from the landowner's consultant, Central Land Consulting, LLC.  This was not the result of directives given by Spire or any of its representatives.

In fact, to diffuse any uncertainty, Spire specifically informed Defendant on April 30, 2020 that "active cropland is allowed to revert to pre-construction use for the *full width of the right-of-way* . . . which includes *normal farming operations such as tillage, fertilizing, planting and harvesting*."  *See* **Exhibit 14** (emphasis supplied).

More importantly, there is no factual basis for Ms. Howard to conclude there is a connection between the problems with access or drainage and crop productivity.  On the contrary, regarding the 2019 growing season, Mr. Simon testified he planted a crop in the southern portion of the Schaeffer parcel after the floodwater subsided.  Mr. Simon testified the *late planting of the crop* contributed to the reduce productivity. *Id.* at 91:17 to 92:11 ("That would be the biggest part of it, yep.").

With respect to the 2020 growing season, Mr. Simon testified he had just planted corn on the southern portion of the Schaeffer parcel outside the right-of-way in early April 2020

24

(notwithstanding the fact he is permitted to plant the right-of-way). **Exhibit 13**, 27:3-10, 28:15-24. No corn has been harvested to date.

Ms. Howard's conclusion that the Schaeffer parcel has diminished in value is based on pure speculation and cannot be supported by a factual basis unless and until a crop is harvested at the end of the current growing season at which time Mr. Simon will be able to compare the yield to yields obtained from prior growing seasons. Even then, Mr. Simon testified crop productivity is highly variable and depends on a multitude of factors, and one such factor is flooding. And, Mr. Simon acknowledged the river levels were again rising this year, which may limit his ability to achieve crop yields comparable to previous years. **Exhibit 13**, 31:2-14.

There is no evidence that alleged access and drainage problems to the southern portion of the Schaeffer parcel has reduced the value of the farmland. The conclusion is speculative, unsupported, and contrary to the facts of the case and should be excluded. *See e.g., Ackerman*, 951 F.3d at 935-36 (excluding plaintiff's expert's opinion on causation because the opinion was based on vague theorizing and amorphous general principles, and there was no record evidence that he used reliable principles and methods or applied them reasonably to the facts of this case to form his opinion).

> 3.  **Ms. Howard's conclusion that the Schaeffer parcel has diminished in value by twenty-three (23%) percent is simply not supported by any facts.**

To support the assumption of a 23% reduction, Ms. Howard also relied on a report ("Report") generated by the University of Missouri Extension Division. **Exhibit 10** (Report), p. 1; **Exhibit 11**, 14:21 to 15:10; 16:4 to 17:9, 68:17 to 69:15.

The Report contains no data generated for cropland values on a per acre basis for St. Charles County. *See* **Exhibit 10**. In addition, the Report contains no data to support the conclusion that farmland in other portions of Missouri is equivalent, or comparable, to the

Schaeffer parcel.  Indeed, Ms. Howard has failed to draw any connection between the farmland in other parts of Missouri upon which her opinions are based, and the specific property in this action.

Simply put, Ms. Howard's 23% reduction in value is not based on any generally accepted principles of valuation—it was pulled out of a hat and is not supported by sufficient facts or data as required by Fed. R. Evid. 702.  *See e.g.*, *JFM Mkt. Corp.*, 946 F.3d at 1000-03 (excluding expert testimony because the expert's data fell short of incorporating all aspects of the relevant markets to demonstrate the conclusions reached were sufficiently reliable).

G.    **Defendant's "Cost To Cure" Damages Should Be Excluded Because Defendant Failed To Comply With Rule 26(a)(2), The Disclosure Is Untimely, And Defendant's Cost To Cure Damages Are Speculative, Unsupported By Sufficient Data And Contrary To The Facts Of The Case.**

On March 30, 2020, Defendant supplemented her answers to written discovery and identified a damage estimate prepared by Mr. William Ontiveros, who is affiliated with Sharpe Estimating Service ("Sharpe"), as an "expert" report.  *See* **Exhibit 16** (Correspondence by Attorney Elefant); **Exhibit 17** (Sharpe estimate).[15]  The Sharpe estimate contains reference to various purported remediation elements, including removal and replacement of soil, erosion control, repair and replacement of drainage ditches and road repair, totaling $3,037,140 to "cure" the Schaeffer parcel.

1.    **Defendant's disclosure is untimely and fails to comply with Federal Rule of Civil Procedure 26(a)(2).**

The deadline for the parties to disclose expert reports was February 24, 2020.  *See* Doc. # 388 (citing Doc. # 380-1).  Defendant did not formally disclose her reliance on the Sharpe

---

[15] Defendant also identified an estimate prepared by Pfeifer Excavating.  *See* **Exhibit 18** (Pfeifer estimate).  Counsel for Defendant, however, indicated she was not using this estimate at the compensation hearing in this matter.  *See* **Exhibit 19** (Ontiveros Depo.), 136:9-24.

Estimate to support damages until March 30, 2020. The disclosure is untimely.  In addition, Defendant failed to provide any additional information as required by Rule 26(a)(2)(B)(i)-(vi). The untimely disclosure of Defendant's expert, and failure to strictly comply with Rule 26's disclosure requirements, merits striking the designation of Mr. Ontiveros and precluding his testimony and report. *See Flesner v. Bayer AG*, 596 F.3d 884, 888 (8th Cir. 2010) (explaining district courts have broad discretion in establishing and enforcing deadlines and excluding expert's report as untimely); Fed. R. Civ. P. 37(c)(1).

2.  **Even assuming Defendant was justified in the late disclosure, the elements of work contained in the Sharpe Estimate are highly variable, were based on conditions that existed on the Schaeffer parcel in May 2019, and the estimate as a whole is inherently unreliable.**

Sharpe, a California based corporation, sells a software program called "SharpeSoft" that an end-user can use to generate job costing bids to the construction industry. **Exhibit 19** (Ontiveros Depo.), 27:13-24.  Mr. Ontiveros explained that Sharpe's business model, for more than 33 years, has been to "strictly provide the estimating software, the job costing software and the management software." *Id.* at 28:17-23. However, over the last six to seven months, Mr. Ontiveros began to prepare estimates for potential construction clients using the software. *Id.* at 28:24 to 29:3.

In February 2020, Mr. Ontiveros was contacted by Central Land Consulting LLC d/b/a Diamond Land ("Central Land")[16] to generate the estimate using the Sharpe software.  *Id.* at 71:3 to 72:12, 76:3-7. To prepare the estimate, Central Land provided Mr. Ontiveros a one page bid sheet, aerial photographs of the Schaeffer parcel in May and December 2019 and Mr. Berning's

---

[16] Spire incorporates by reference its Motion to Compel and Memorandum in Support filed on June 15, 2020 (Doc. # 439-440) for background information relating to Mr. Nathan Laps and Central Land.

soil report. *Id.* at 58:9-13, 58:21-23, 73:6-15, 81:18 to 82:3; **Exhibit 20** (bid sheet).[17]   Mr. Ontiveros made no assumptions about the bid sheet or had any specific conversations with Central Land concerning the bid sheet. **Exhibit 19** (Ontiveros Depo.), 74:10-16.   In fact, he testified he does not know specifically who prepared Exhibit 20.   *Id.* at 58:21:23.   In addition, Mr. Ontiveros prepared the estimate based on conditions that existed on the Schaeffer parcel in mid to late 2019.   *Id.* at 61:15-19, 124:22 to 135:6.

Mr. Ontiveros is not qualified to render an opinion as to whether the actual scope of work contained in the Sharpe estimate is necessary, the elements of work are not based on sufficient facts or data as required by Fed. R. Evid. 702, and the estimate as a whole is inherently unreliable.

First, Mr. Ontiveros repeatedly admitted he is not an agronomist or soil scientist and is not qualified to opine whether the work identified in the estimate was actually necessary from the perspective of soil productivity or farming operations.   *Id.* at 57:8 to 58:8, 86:19 to 87:19, 88:4-12, 88:23 to 89:3.   Mr. Ontiveros estimated, however, it would cost $939,390 to remove and replace 3.85 acres of "damaged" topsoil within the easement.   **Exhibit 20** (bid estimate).   The elements of topsoil removal were derived from the bid sheet provided to Mr. Ontiveros by Central Land.   *See id.*[18]

There are insufficient facts or data to conclude all the topsoil on the Schaeffer parcel within the right-of-way needs to be removed. To the contrary, Mr. Berning conceded the *soil chemistry and nutrient values for all 28 test pit sites were uniform*.   **Exhibit 5** (Berning

---

[17] Mr. Ontiveros explained he was unaware this estimate was going to be used in litigation.   *Id.* at 83:7-18 ("I'll be honest, if I'd have known it was going to go for something for litigation, I probably would have refused to be involved.").

[18] Central Land (including Mr. Laps), however, is not qualified to opine as to the current soil content or quality on the Schaeffer parcel.   *See* Spire's Motions in Limine No. 5, incorporated herein as though fully set forth.

Depo.), 113:1 to 114:5, 118:5-111, 120:5-10.  Mr. Ontiveros did not discuss or otherwise review the estimate with Mr. Berning after it was prepared, **Exhibit 19** (Ontiveros Depo.), 97:8-19, and it is clear no soil scientist or agronomist has opined whether the elements of work contained in the estimate with regard to soil are necessary from the perspective of soil productivity or farming operations.

Similarly, the remaining elements of work relating to erosion control and road damage are also not supported by sufficient facts or data.  For example, Mr. Ontiveros estimated it would cost $2,047,000 for "erosion control." **Exhibit 20** (bid estimate). As part of this work, Central Land directed Mr. Ontiveros to assign an estimate for repair and replacement of 5,250 feet of drainage ditches.  **Exhibit 19** (Ontiveros Depo.), 119:3-12, 120:22 to 121:21.  However, there is no evidence to conclude 5,250 feet of drainage ditches need to be replaced on the Schaeffer parcel.[19]

Moreover, Mr. Ontiveros repeatedly admitted the elements of work contained in the estimate are highly variable and subject to change. *Id.* at 65:18 to 68:20, 110:25 to 111:6. Mr. Ontiveros explained if another estimator prepared the same estimate the costs for each element of work identified in the estimate would be different.  *Id.* at 106:15 to 107:12 ("Yeah. 100 percent."); 113:16-20, 116:18-22.  Indeed, because this estimate was prepared in 2019, Mr. Ontiveros explained he would need to create a completely new estimate to accurately reflect the costs of work based on the current site conditions of the property.  *Id.* at 128:24 to 129:3,

---

[19] In addition, the Sharpe estimate clearly includes work for *off the right-of-way*—erosion repair for *5.50 acres of land.*  Defendant is already seeking damage to areas off (and on) the right-of-way in a separate action currently pending is the Circuit Court of St. Charles County. *See* Section G.3, *infra*.  Further, Defendant (or Central Land) is seeking an upgrade.  Specifically, the estimate includes a line item for "road damage" with a cost of $50,750.  Defendant (or Central Land) seeks to install concrete over portions of the access easement which were gravel prior to the pipeline.  **Exhibit 19** (Ontiveros Depo.), 69:7 to 70:15. There is no scientific (or other) basis why Defendant needs to upgrade the gravel access road to concrete.

129:11-15, 134:17 to 135:6 ("Again, if this was going to bid, I think that there would be a lot more work that would need to happen to generate – I wouldn't want to say accurate but more exact numbers to the scope of work that would be needed.").[20]   Mr. Ontiveros further conceded if Spire continued to do remediation work on the Schaeffer parcel, *see* Section B.II, *supra*, the additional work would affect the conclusions he reached in the estimate. *Id.* at 91:13 to 92:1.  This is why the elements of work identified in the Sharpe estimate fail to help the Commission determine a fact in issue as explained in Section D, *supra*.

Defendant has failed to carry the burden of proving the scope of work contained in the Sharpe estimate is necessary or justified from a scientific perspective.  In addition, the work outlined in the estimate is based on work Central Land believes is appropriate, but it is clear there is no factual basis to conclude Central Land has any expertise or competency to outline the allegedly necessary scope of work.  The estimate as a whole is inherently unreliable and should be excluded.  Fed. R. Evid. 702 and Fed. R. Evid. 403.

3.   **Missouri law does not permit the Commission to consider Defendant's cost to cure damages.**

Missouri law does not permit a landowner to recover both diminution in value and cost to cure damages. Rather, the Missouri Supreme Court has held cost to cure damages are only recoverable where the cost of restoring the property *is less than* the diminution in value of the property. *See State ex rel. State Highway Comm'n v. Herman*, 405 S.W.2d 904, 908 (Mo. 1966); *State ex rel. State Highway Com. v. Bruening*, 326 S.W.2d 305, 310 (Mo. 1959).

---

[20] Another portion of the $2,047,000 estimate for "erosion" control included removal of standing water from approximately 1.07 acres.  This was based on photographs of the Schaeffer parcel in May and December 2019.  *Id.* at 60:6 to 61:23, 62:20 to 63:6.  Mr. Ontiveros agreed he has no knowledge of whether the site conditions in 2019 are present today, and he would need to know what the current site conditions were to prepare an accurate bid.  *See id.*

Defendant's alleged damages exceed the diminution in the fair market value of the Schaeffer parcel at the time of the taking. Indeed, Ms. Howard conceded these damages are not proper in this condemnation proceeding because "*it was in excess of my opinion of diminution in value. So I did not use it based on my opinion . . . If the damages exceed the loss in value then the appropriate compensation would be the loss in value.*" Exhibit 11 (Howard Depo.), 62:20 to 63:14 (emphasis supplied); *see also* **Exhibit 10** (Howard Report), p. 19 (explaining the cost to cure estimate "would reportedly correct the issues with the easement area as well as the remainder. *However, this amount exceeds my estimated decrease in market value as a result of the permanent easement. Therefore, I have based my estimate of damages as a result of the permanent easement.*") (Emphasis supplied).

Moreover, there is a danger of double recovery because Defendant is claiming the same damages in a separate proceeding in *Saale Family LP, et al v. Spire STL Pipeline LLC, et al.*, Cause No. 1911-CC00439-01. *See* **Exhibit 21** (State Court Petition), ¶¶ 216-218. Defendant attached what appears to be the same estimate prepared by Pfeifer Excavating as "Exhibit 7D" to the State Court Petition—which has now been replaced by the Sharpe estimate in this proceeding—claiming the estimate represents the "cost to remediate the damages incurred by [Spire's] actions . . . ." *See* Petition, ¶ 220. Defendant is clearly trying to double dip.

**H.    Defendant's Crop Loss Claims Are Based On Incorrect And False Information, Pure Speculation And Exceeds The Scope of Recoverable Damages In This Condemnation Proceeding.**

      1.    **Defendant's 2019 crop loss claims.**

In discovery, Defendant produced a "crop loss" table, claiming $74,911.33 in damages due to the inability to harvest a crop during the 2019 calendar year on the *entire* Schaeffer parcel as a result of the construction of the pipeline. *See* **Exhibit 23**. Mr. Simon did not prepared this

document and has not knowledge of the numbers contained therein. **Exhibit 13** (Mr. Simon Depo.), 87:7 to 89:7.

To the extent Defendant is claiming crop loss to areas outside the easement caused by Spire's construction activities, this is improper. *See e.g., Citizens Electric Corp. v. Amberger*, 591 S.W.2d 736, 738 (Mo. App. E.D. 1979) (explaining "tortious destruction of property off of the easement right-of-way is the subject of a separate tort action.") (Citing *Kamo Electric Cooperative v. Baker*, 287 S.W.2d 858, 861-62 (Mo. 1956)). In fact, Defendant is similarly raising a claim of crop loss in the State Court proceeding.[21]

Even assuming Defendant is limiting the crop loss claim to the right-of-way, Defendant's crop loss table is based on incomplete and false information. Specifically, Defendant's inability to harvest corn during the summer of 2019 was caused by the flooding that occurred due to the rising Mississippi and Missouri rivers. **Exhibit 13** (Mr. Simon Depo.), 75:20 to 76:8, 28:25 to 29:4, 30:13-15, 47:20 to 48:2, 48:16-21; *see also* **Exhibit 22** (aerial view of the Schaeffer parcel obtained on June 10, 2019).[22] Moreover, Mr. Simon testified he was able to harvest a crop in 2019—soybeans—although the *late planting of the crop due to the flooding* contributed to the reduce productivity. *Id.* at 91:17 to 92:11; *see also* **Exhibit 25**, ¶ 22 (in which Defendant conceded in response to written discovery the following: "During the summer of 2019, crops were lost due to massive floods and were planted late. As a result, yields were lower *but it is not possible to discern whether yields were lower due to late planting, loss of topsoil and*

---

[21] Defendant alleges in the State Court action that the Schaeffer parcel has sustained "damaged by loss of crops; lower yields of crops; increased burden and costs of farming; repairing fields and ditches; restoring and reclaiming soil and land to the condition they were in prior to Defendants' actions; cleaning and removing Defendants' construction debris; and the lost use of the funds for the preceding items, all in an amount in excess of $25,000.00." **Exhibit 21**, ¶ 242.

[22] Indeed, Mr. Simon testified an insurance claim was submitted as a result of "Mother Nature". *Id.* at 76:9-11.

*compaction caused by the pipeline or both*.")  Defendant's "crop loss" table is based on incomplete and false information and should be excluded.

**2.      Future alleged crop loss productivity.**

In his report, Mr. Berning claims if remediation does not occur within the easement area, the Schaeffer parcel will suffer from future crop productivity.  **Exhibit 4**, p. 6 (SCHAEFFER 001269); *see also* **Exhibit 12** (Simon declaration), ¶¶ 9-10.

First, Mr. Simon has made the decision not to plant in the right-of-way.  At deposition, Mr. Simon testified he was told by his uncle who farms the Knobbe farm that his attorney (the uncle's attorney) said "we're not to get on [the easement] until this is all resolved." **Exhibit 13**, 58:2-9, 58:20-23.  Unfortunately, it appears landowners are receiving similar information from Central Land recommending to the landowners that they "abstain[] from farming within the easement area for at least three years following pipeline construction." **Exhibit 24** (Spire Status Report No. 69), p. 12.

Spire has not informed Mr. Simon that he cannot farm the easement area for the 2020 growing season. **Exhibit 13** (Simon Depo.), 58:25 to 59:12.  To the contrary, Spire has directed Defendant to resume farming operations within the easement.  *See* **Exhibit 14**.  In addition, Spire has responded to Central Land's "recommendation", informing landowners that resuming farming operations within the right-of-way plays a vital role in the revegetation process, to the extent there is any impairment, by restoring soil health, structure, function, and microbial activity after disturbance.  **Exhibit 24** (Spire Status Report No. 69), p. 12.  *See also* **Exhibit 5** (Berning Depo.), 20:20-25, 21:24 to 22:3 (agreeing to same).

Mr. Simon cannot abstain from farming the easement area and then claim damages due to loss of crop productivity.  That would be fundamentally unfair and result in a windfall to

Defendant. Failure to farm within the easement area also amounts to a failure to mitigate damages.

In addition, assuming Mr. Simon resumed farming operations within the easement, whether Defendant will suffer from a decrease in crop productivity is based on pure speculation and conjecture.

In *State ex rel. Kansas City Power & Light Co. v. Salmark Home*, the Missouri Supreme Court explained "[d]amages which are sought on the theory of injury to the remainder of land after the taking of a part must be *direct and certain at the time of the appropriation* and, conversely, *not remote or speculative*; a loss of profits is usually regarded as too speculative and remote to be considered as a basis for ascertaining the damages in a condemnation proceeding."  375 S.W.2d 92, 98-99 (Mo. 1964) (emphasis supplied); *see also Clay v. Missouri Highway & Transp. Comm'n*, 951 S.W.2d 617, 629 (Mo. App. 1997).  Future lost profits "are recoverable '*only when they are made reasonably certain by proof of actual facts* which present data for a rational estimate of such profits.'"  *Clay*, 951 S.W.2d at 629 (quoting *Anuhco, Inc. v. Westinghouse Credit Corp.*, 883 S.W.2d 910, 923 (Mo. App. 1994)) (emphasis supplied).

Mr. Berning and Mr. Simon testified their conclusion about the possibility of future crop production (i.e., lost future profits) is based on pure speculation at this time. *See* **Exhibit 5** (Berning Depo.), 125:21 to 127:5; **Exhibit 13** (Simon Depo.), 74:2 to 75:6, 75:17-19 (testifying he would he would "have no idea" whether the Schaeffer parcel would suffer a decrease in crop productivity as a result of the pipeline once he resumes full farming operations of the entire parcel).  At the end of the day, each farming season is different, the Schaeffer parcel is subject to flooding and conditions change every year. Defendant's decrease in crop productivity theory is too remote, speculative, and dependent upon changing circumstances to warrant recovery.

<u>CONCLUSION</u>

For the reasons stated herein, Spire respectfully requests that the Court enter an Order excluding the testimony and reports of Mr. Berning; Ms. Howard's report and testimony relating to the 106 acres of farmland south of the easement; Mr. Ontiveros testimony and the Sharpe estimate; Defendant's crop loss claims; and grant such other and further relief as is just and proper under the circumstances.

Respectfully submitted,

HAMILTON WEBER LLC


<u>/s/ David. T. Hamilton</u>
David T. Hamilton      #28166
John H. Kilper          #60992
Jared Howell            #67332
200 North Third Street
St. Charles, MO  63301
(636) 947-4700 (Phone)
(636) 947-1743 (Facsimile)
dhamilton@hamiltonweber.com
jkilper@hamiltonweber.com
jhowell@hamiltonweber.com

ATTORNEYS FOR PLAINTIFF
*Spire STL Pipeline*

35

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing document was served this 26th day of June, 2020, by Notice of Electronic Filing pursuant to Fed.R.Civ.P. 5(b)(2)(E), to:

Jordan Walker, Esq.
Sever Storey, LLP
881 3rd Avenue SW, Suite 101
Carmel, IN  46032
Jordan@landownerattorneys.com
*Counsel for Defendants*
*William W. Kaufmann and Donna*
*Kaufmann Trust Dated Mar 4, 2017, et al.*

Joseph A. Ott, Esq.
OTT Law Firm
3407 S. Jefferson, Ste. 508
St. Louis, MO 63109
314-293-3756
jott0519@gmail.com
*Counsel for Defendants Dennis H. Schaeffer Trust*
*Dated March 2, 1995 et al.*

Carolyn Elefant, Esq. *pro hac vice*
1440 G Street, NW
Washington, DC 20005
Carolyn@carolynelefant.com
*Counsel for Defendants Dennis H. Schaeffer Trust*
*Dated March 2, 1995 et al.*

/s/ David. T. Hamilton