UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SPIRE STL PIPELINE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Consolidated action |
| v. | ) | No. 4:18 CV 1327 SRC / DDN |
| | ) | |
| 3.31 ACRES OF LAND, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**
**REGARDING EXPERT OPINION EVIDENCE**

This action is before the Court on the following motions:

(a)    of plaintiff Spire STL Pipeline, LLC,

(1)    to exclude the expert testimony and strike the reports of defendants' experts Gerald Berning, Donna Howard, and William Ontiveros (Doc. 452); and

(2)    to exclude the expert testimony and strike the reports of defendants' experts Linda Atkinson and Naag Rao, and to exclude evidence of the cost to restore and of crop loss damages (Docs. 474, 505);

(b)    of defendants Virginia Schaeffer and the Schaeffer Trust ("Schaeffer parcel") to exclude the opinion of plaintiff's expert witness appraiser Cory Sell (Doc. 455);

(c)    of defendants Alan and Sharon Poggemoeller ("Poggemoeller parcel") to exclude the opinion of plaintiff's expert witness appraiser Cory Sell (Doc. 477);

(d)    of defendants Kevin and Shelley Machens ("Machens parcel") to exclude the opinion of plaintiff's expert witness appraiser Cory Sell (Doc. 504); and

(e)    of defendants Alan and Sharon Poggemoeller to exclude the opinion and rebuttal report of plaintiff's expert witness Aaron DeJoia (Doc. 490).

These motions were heard by the Court on December 29, 2020.

- 1 -

## BACKGROUND

Under the Natural Gas Act, 15 U.S.C. § 717f(h), plaintiff Spire has acquired by eminent domain easements on parcels of defendants' real estate for its construction of a 65-mile natural gas pipeline.  The pipeline, now constructed, extends from the Rockies Express Pipeline in Scott County, Illinois, south through St. Charles County and St. Louis County, Missouri, and terminates at the Enable Mississippi River Transmission Line in St. Louis County, in this judicial district.

The Court has established a Commission to receive and consider evidence of the compensation due defendants for plaintiff's taking of the easements for the pipeline construction.  The parties are prepared to offer expert testimony and reports to aid the Commissioners in their factfinding.  The parties are challenging the admissibility of the opposing experts' opinions.

Regarding the Schaeffer parcel, plaintiff Spire moves to exclude the expert opinion testimony and reports of two experts, Gerald Berning and Donna Howard and the damages estimate prepared by William Ontiveros. (Doc. 452 at 1.)  Regarding the Poggemoeller and Machens parcels, plaintiff moves to exclude the expert opinion testimony and reports of soils expert Dr. Naag Rao and appraiser Linda Atkinson. (Docs. 474, 506.)

On April 8, 2020, Spire disclosed its expert witness, Corey Sell of CBRE, a valuation company.  (Doc. 477 at 1.)  On June 18, 2020, Spire disclosed Aaron DeJoia, as a rebuttal expert witness to defendants' construction damage expert, Dr. Naag Rao. (Doc. 490 at 1.)

## RELEVANT PRINCIPLES

To be admissible, the proponent of expert opinion evidence must show that the opinion is reliable and will be helpful to the Commissioners in their decisionmaking, and that the respective expert is qualified to be a witness.  Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note.  This showing must be made by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 176 (1987); *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).

Under Federal Rule of Evidence 702, the Court must first find that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.  Fed. R. Evid. 702.  If the Court makes this finding, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion, provided (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. *Id.*; *United States v. White Horse*, 316 F.3d 769, 775 (8th Cir. 2003).  An expert must explain how he or she arrived at his or her conclusions; the trial court may not simply take the expert's word for it.  Fed. R. Evid. 702 advisory committee's note; *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005).

Rule 702 incorporates the rulings of the Supreme Court's decisions in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).  Fed. R. Evid. 702 advisory committee's note.  In those cases, the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony. *Daubert*, 509 U.S. at 597; *Kumho Tire*, 523 U.S. at 141.  The trial judge must follow the standards of Rule 702, but can also consider the four factors found in *Daubert*.  Fed. R. Evid. 702 advisory committee's note; *Kumho Tire*, 526 U.S. at 140–41 ("[T]he test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case.").  These four, non-exclusive factors are: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the technique has a known rate of error or standards controlling its operation; and, (4) whether the theory enjoys general acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 592–94.

Rule 702 remains one of admissibility rather than exclusion. *Shuck v. CNH Am., LLC*, 498 F.3d 868, 874 (8th Cir. 2007).  Any doubt "whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998).  Finally, as with all evidence, an expert's testimony's

probative value must not be admitted, if it is substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.  Fed. R. Evid. 403.

## **DISCUSSION**

In this case, the Commission will decide the amounts of compensation due to the landowners for the easements plaintiff Spire took.  Under Missouri law, a landowner subject to a partial taking is entitled to "just compensation" for the property taken, including the temporary and permanent easements in this case, equal to the fair market value at the time of taking, also known as the "before and after rule,' "at its highest and best use."  *St. Louis City v. Union Quarry & Construction Company*, 394 S.W.2d 300, 305 (Mo. 1965); Mo. Rev. Stat. § 523.001(1) (measuring fair market value by calculating the difference between the fair market value of the entire property immediately before and the remaining or burdened property immediately after taking).

Plaintiff Spire challenges the reports and testimony of defendants' experts regarding the Schaeffer parcel, the Poggemoeller parcel, and the Machens parcel. (Docs. 452, 474, 505.)  And the defendant landowners challenge plaintiff's expert Corey Sell, regarding the same parcels (Docs. 455, 477, and 504, respectively.  Defendants also seek to exclude rebuttal expert Aaron DeJoia regarding the Poggemoeller parcel. (Doc. 490.)

### Gerald Berning and Donna Howard
### and topics of soil damage and damage to remainder

Spire argues that the Court should exclude the reports and testimony of Mr. Berning and Ms. Howard regarding soil damage and alleged damage to the remainder ("Construction Damage") since Spire has a continuing obligation to address and resolve these types of issues under the Federal Regulatory Energy Commission ("FERC") Certificate of Public Convenience and Necessity ("Certificate"); therefore, the opinion testimony of these experts will not help the Commissioners to determine a fact in issue. (Doc. 453 at 4.)  Regarding the Schaeffer parcel, defendant argues the testimony is

relevant, further arguing that Spire has completed its restoration efforts and that adverse impacts can be discerned now.

Regarding the expert opinions of Mr. Berning and Ms. Howard, Spire argues their expert testimony will not help the Commissioners determine a fact in issue due to Spire's ongoing obligation to address and resolve restoration.  Spire notes there is no factually similar Missouri case regarding condemnation and post-construction monitoring obligations under the FERC but directs the Court's attention to the ruling in *Rover Pipeline, LLC v. 10.055 Acres of Land*, No. 5:17-CV-239, 2018 U.S. Dist. LEXIS 217574 at *1 (N.D. Ohio Dec. 28, 2018). (Doc. 453 at 11.)  Conversely, defendant argues the testimony is admissible and that *Rover* is distinguishable to this case.

In *Rover*, the United States District Court excluded the soil expert's testimony because it would not help the trier of fact determine the relevant facts. *Rover* at *26-27. Spire correctly notes that *Rover* has many factual similarities to the instant case.  In *Rover*, as here, the condemned property included a temporary easement and a smaller permanent easement, the remaining fact issue was the amount of compensation, and a monitoring program adopted by the FERC potentially impacted the motion to exclude the soil expert's testimony. *Id.* at *16, 26-27.  That case involved the FERC post-construction monitoring program; therefore, that court looked to the language of the FERC, the Agricultural Impact Mitigation Plan, and Rover's commitment to the landowners. *Id*. at *16-24

In the instant case, on January 26, 2017, Spire filed its application to construct the pipeline with FERC. (Doc. 453 at 5.)  The FERC, among other things, determines public necessity, promulgates extensive regulations that control the issuance of certificates, and conducts public hearings on each application. (*Id*. at 4.)  Once FERC issues a Certificate, the holder has the "right of eminent domain" over the lands needed for the construction of the pipeline. 15 U.S.C. §717f(h).

Also in this case, the FERC conducted an environmental review of the proposed project and prepared an Environmental Assessment ("EA").  On August 3, 2018, FERC issued the Certificate authorizing Spire to proceed with the project, conditioned on "(3)

Spire's compliance with the environmental conditions listed in the appendix to this order" which Spire identifies as FERC Environmental Condition Nos. 1 through 22 identified in the Certificate. (*Id*. at 82-83.)  FERC Commissioners delegated authority to its Director of Office of Energy Projects to monitor Spire's compliance with the environmental conditions. (Doc. 453 at 7.)

On November 14, 2019, the FERC sent written correspondence to Spire, that a recently filed inspection stated the following:

> Staff has confirmed, based on our November 12-14, 2019 field inspection and Spire's most recent construction status report filed November 7, 2019, that Spire has adequately stabilized the construction workspaces and that restoration is proceeding satisfactorily.  Further, I note that pursuant to the Order, Spire is required to monitor restoration and revegetation along the right-of-way and address landowner concerns.  We will continue to monitor and inspect the project right-of-way to ensure that Spire follows through with its obligation and to ensure that restoration and revegetation is successful.
>
> I remind you that Spire must comply with all applicable remaining terms and conditions of the Order.

(Doc. 453-3.)    Spire also references sections of the EA and Spire's requirements to provide quarterly reports documenting the results of follow-up inspections, including those identified by the landowners, and corrective actions taken for at least 2-years following construction.

Defendant argues that *Rover* is distinguishable from this case.  In *Rover*, the natural gas company committed to:

> compensating agricultural landowners "for a full 3 years (from the start of construction) of productivity on lands impacted by the construction' [and] [i]t also promised to continue to monitor crop yields for the first five years and compensate landowners if yield reduction in the described areas was higher than originally estimated.

*Rover* at *17-18.  In that case, the district court noted that the Final Environmental Impact Statement (FEIS) in the case was initially critical of Rover's plan because it placed the burden on the landowner to report concerns. *Id*. at *19.  Therefore, FERC

recommended that, prior to construction, "Rover should file . . . a 5-year post-construction monitoring program to elevate crop productivity in the areas impacted by the construction of the pipeline" to put the burden on Rover.  *See id.*  FERC granted Rover's application conditioned on its compliance with certain environmental conditions and the filing of the five-year monitoring program.  *Id.* at 20.

Spire argues its mitigation plan consists of FERC's guidelines contained in the *Upland Erosion Control, Revegetation, and Maintenance Plan*, *Wetland and Waterway Construction and Mitigation Procedures*; "additional construction, restoration, and mitigation plans prepared specifically for the project"; and FERC Environmental Conditions 1 through 22 referenced in the FERC Certificate (*see* Spire STL Pipeline Project Implementation Plan, FERC Docket Nos. CP17-40-000 and CP17-40-001 dated August 2018).

In contrast to *Rover*, Spire did not commit to compensation and a long-term monitoring and restoration plan.  The *Upland Erosion Control, Revegetation, and Maintenance Plan*, *Wetland and Waterway Construction and Mitigation Procedures*, provided by Spire, are FERC documents which are not unique to Spire.  Spire references section VII.A.1 of that document, which describes post-construction activities and reporting required of Spire, including: "1. [Spire will] [c]onduct follow-up inspections of all disturbed areas, as necessary, to determine the success of revegetation and address landowner concerns.  At a minimum, conduct inspections after the first and second growing season[;]" and, "3. Monitor and correct problems with drainage and irrigation systems resulting from pipeline construction in agricultural areas until restoration is successful." (*Upland Erosion Control, Revegetation, and Maintenance Plan*, May 2013 Version at 17.)

Spire's mitigation plan is distinguishable from the one described in *Rover.*  Spire's commitment, if any, to the landowners is not clear.  For example, Rover was committed to compensating the landowners for a full three years and promised to continue monitoring crop yields for the first five years and to compensate landowners.  In Spire's case, the onus is not on Spire.  Instead, the applicable language merely requires follow-up

inspections *as necessary* to *address* owner concerns, quarterly reports including those issues *identified by the landowners*, and requires Spire to take *corrective actions* for at least two years, although it is unclear what those actions may be.  To the extent Spire references its compliance with the environmental conditions listed in the Appendix to the FERC Order, Spire offers responses to each environmental condition but its commitment remains unclear.  This is because Conditions 1 through 22 do not significantly apply to the landowners or issues in the instant motion.  Generally, in Spire's words, if a *landowner reports* a concern Spire *will investigate* and *as necessary address* the landowner's concerns.  This is not like the clear compensation and commitment reviewed by the district court in *Rover*.

Next, defendant argues that adverse impacts can be discerned now.  On January 7, 2020, Spire reported to the FERC that restoration was 100% complete, further noting that Spire has had numerous opportunities to complete restoration and address landowner's existing concerns. (Doc. 456 at 2.)  Spire disagrees since the FERC requires Spire to file weekly status reports until all construction and restoration activities are complete. (Doc. 453, Ex. 1.)

On March 13, 2020, Spire filed Status Report No. 65 indicating that restoration was 100% complete.  However, Spire argues that Status Report No. 65 referenced by the defendant was referring to restoration "during construction." (Doc. 485 at 8.)  This argument is without merit because the FERC documents and Spire's corporate designees negate Spire's contention that restoration remains incomplete.  As previously noted, on November 11, 2019, four months before Status Report No. 65, the FERC sent written correspondence to Spire, that a recently filed inspection confirmed "restoration is proceeding satisfactorily." (Doc. 453, Ex. 3.)   Moreover, Spire's two corporate designees, Russel English and Doug Sipe, testified on May 15, 2020 that restoration work was completed on the Schaeffer property. (*See* Doc. 465, Ex. 1, English Dep. 30:18-35 and 31:1-4; *see* Ex. 1, Sipe Dep. 26:12-22, 79:20-24.)  Moreover, Spire's expert, Mr. DeJoia, denies that topsoil was ever lost or that compaction ever took place which makes it unlikely that Spire will see a need to restore topsoil on that parcel. (Doc. 465, Ex. 4,

DeJoia Dep. 108:7-11, 111:3-8; Ex. 3 DeJoia R. 11.)  To the extent Spire points to delays in restoration due to flooding in 2019, it will have had ample time to address the restoration concerns before the case is heard by the Commissioners.

The Court concludes that Spire has not clearly expressed an intention to complete further restoration[1] without burdening the landowners to submit ongoing complaints or further legal action.  This leaves the landowners with an unclear situation.  Nevertheless, the Court finds at least some adverse impacts can be discerned now.

Accordingly, the reports and testimony of Mr. Berning regarding soil damage and Ms. Howard regarding alleged damage to the remainder are likely to be helpful to the factfinder. Accordingly, their testimony on those topics is admissible.

## Gerald Berning and soil compaction

In its reply to defendant's opposition to the instant motion, Spire also argues that Gerald Berning's compaction results are not scientifically valid.   Specifically, Spire points to Berning's failure to use a penetrometer, a cone tipped rod attached to a gauge that is pushed into the soil at a constant rate, and the lack of scientific testing to verify the level of compaction. (Doc. 485 at 15.)  Defendant argues that Berning's inability to run scientific tests due to wet conditions does not render his opinion on compaction unreliable or inadmissible. (Doc. 465 at 8.)

Berning is a Certified Professional Soil Classifier with the Illinois Soil Classifier's Association.  He holds a bachelor's degree in agronomy and has more than 40 years of experience classifying soils over which time he has mapped between 500,000 and 600,000 acres of soils. (*Id*., Ex. 1, Berning Dep. 42:14-24; 49:4-13; 60:1-5.)  In preparing his report he drew upon scientific research and literature and his own extensive experience, pointing to three professional references in support of the conclusions in his

---

[1] To the extent Spire claims that it cannot restore the right-of-way until after the 2020 growing season and harvest is complete, at the time the Commissioners hear the instant case that restoration will have been complete, according to Spire, in late 2020. (Doc. 485 at 8.)

report. (*Id.*, Ex. 1 at 16-18.)   Further, relying on his experience, Berning identified compaction in soil through visual characteristics listed in the University of Wisconsin Extension Study. (*Id.*, Ex. 1 at 56.)   Notably, Spire's soil expert's testimony supports defendant's argument, in that, he noted "being in the field and touching and feeling the soil is always better." (*Id.*, Ex. 1, DeJoia Dep. 25:8-10.)

The cited deficiencies in Berning's report do not justify exclusion under Rule 702. He has specialized knowledge that will help the trier of fact to understand the evidence. His testimony is based on sufficient facts, and his testimony is the product of reliable principles to which he applied to the facts of the case.   Any question raised by his methodology goes to the weight and not admissibility of his testimony.

Accordingly, Gerald Berning is not excluded as an expert witness.

### Donna Howard

Spire next argues that Donna Howard is not qualified to render an opinion on the quality of the Schaeffer parcel prior to the pipeline installation, or in the alternative, if qualified, her opinions are speculative and unsupported by sufficient data. (Doc. 453 at 20-23.)   In response, defendant argues that Ms. Howard is highly qualified and that any disagreement goes to the weight of her testimony not its admissibility. (Doc. 465 at 9.)

Ms. Howard has substantial experience in appraising real estate.   She is an MAI qualified appraiser who has appraised properties since 1998 and appraises approximately 30 agricultural properties per year. (Doc 465, Ex. 1, Howard Dep. 8:13-19; 17:15-18.) Although Spire does not challenge Ms. Howard's credentials as an appraiser, it contends she lacks expertise in valuing farmland and property encumbered by a pipeline, specifically in St. Charles County. (Doc. 453 at 20.)   Spire also argues Ms. Howard lacks experience analyzing soil chemistry or nutrients.   However, the amount of an expert's training or experience goes to the weight of the testimony, not its admissibility.   *Robinson v. GEICO Gen. Ins. Co*. 447 F.3d 1096, 1101 (8th Cir. 2006) (generally gaps in an expert witness's qualifications or knowledge go to the weight of the witness testimony).

Although Spire agrees Ms. Howard is qualified to determine the value of the permanent and temporary easements (Doc. 485 at 16), it argues that Ms. Howard's conclusions that the parcel has diminished in value 23 percent is speculative.  The Court disagrees.  First, the 2020 growing season has now concluded and crop data is available to the parties.  Second, Spire argues Ms. Howard's twenty-three percent reduction is an assumption based on a report with no Missouri data. (Doc. 453 at 25.)  However, the following information from Anthony Simon, the current farmer on the property, relates to the specific parcel and is referenced by Ms. Howard:

> • Anthony Simon was forced to change his path while farming (Ex. 6, Simon Dep. 22:17-19);
> • Mr. Simon was unable to access or farm the easement, forcing him to change the timing of his crop rotation on the land (*id.* at 32:12-14; 37:20-24; 71:14-24; 134:3-6);
> • Mr. Simon had to work around the easement in order to plant elsewhere, forcing him to plant in short rows on one side, which makes farming take longer (*id.* at 49:13-20; 50:8-25; 70:17-20; 133:19-23);
> • the easement is not in the same condition as it was prior to the pipeline construction (*id.* at 51:11-16; 86:1-5);
> • the land above the pipeline isn't draining properly (*id.* at 52:2-13);
> • damage to the land surrounding the easement (*id.* at 58:7-12);
> • restoration of the Schaeffer property has not met the conditions relating to topsoil segregation, soil compaction mitigation, and restoration of drainage patterns (Berning R. 6);
> • the topsoil depth over the pipeline which averaged 12.5 inches in thickness prior to the excavation is now an average of 6.8 inches and is mixed with subsoil in several sites (*id.*);
> • the soils were severely compacted during excavation for the pipeline (*id.*);
> • and without remediation, there will likely be a significant decrease in the productivity of the impacted soils, affecting how the field is managed for the production of commodity crops for many years (*id.*)

(Doc. 465 at 9-10.)

"The factual basis of an expert's opinion goes to the credibility of the testimony, not the admissibility[,]" and "only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the [Commissioners] must such testimony be excluded." *Larson v. Kemper*, 414 F.3d 936, 941 (8th Cir. 2005).

These matters are admissible and the weight of the evidence is committed to the Commissioners.

### **William Ontiveros, the ShapeSoft Report, and Cost-to-Cure**

Spire argues the damage estimate ("Sharpe Estimate") prepared by William Ontiveros, who is affiliated with Sharpe Estimating Services, is untimely pursuant to Fed. R. Civ. P. Rule 26(a)(2).  (Doc. 453 at 26.)  Spire further argues that the cost-to-cure damages are speculative.  Conversely, defendant argues the report is admissible.

The deadline for disclosing expert reports was February 24, 2020. (Docs. 380, 388.)  On March 30, 2020, defendant untimely disclosed her reliance in the Sharpe Estimate to support damages.  Defendant argues that Spire was not prejudiced by the delay since it had the opportunity to depose Mr. Ontiveros who prepared the estimate. (Doc. 465 at 12.)  Defendant further notes that she produced this supplemental report only after the contractor who had prepared the original estimate a year earlier could not be located to testify.  (Doc. 465 at 12.)  The Court concludes that defendant was justified in the late disclosure and any prejudice to the late disclosure is lessened by an adequate opportunity to depose and rebut the information.

Turning to the cost to cure damages, Mr. Ontiveros generated an estimate using Sharpe software and a one-page bid sheet, aerial photographs of the Schaeffer parcel in May and December 2019, and Mr. Berning's soil report. (Doc. 453 at 27-28.)   However, defendant's expert Ms. Howard, as part of her report, considered but rejected the Sharpe Estimate prepared by Mr. Ontiveros, finding that the cost-to-cure factor exceeded the diminished value of the property and, therefore, was not an appropriate measure of the value of the taking under Missouri law. (*Id*. at 465.)  Mr. Ontiveros prepared his report in 2019 and explained he would need to create a new estimate to accurately reflect the cost of work based on current site conditions. (Doc 454, Ex. 12, Ontiveros Tr. 128:24-25; 129:3-9.)

In *Rover*, that district court, discussing post-construction mitigation, noted there was "no way to know at this time if those measures will be ineffective."  Although the

mitigation factor in *Rover* is distinguishable here, the same reasoning applies to the crop loss factor in this case.  The Commissioners cannot know if the pipeline construction will diminish future crop yields at all.  Further, the Missouri Supreme Court explained that "loss of profits is usually regarded as too speculative and remote to be considered as a basis for ascertaining the damages in a condemnation proceeding." *State ex rel. Kansas City Power & Light Co. v. Salmark Home Builders, Inc.*, 375 S.W.2d 92, 98-99 (Mo. 1964).

Defendant correctly acknowledges that the Commissioners who will hear the case are both lawyers and appraisers with real estate expertise.  (Doc. 465 at 14.)  Therefore, it is unlikely that the defendant will experience a negative impact due to exclusion of the Sharpe Estimate.  To the extent the other experts address crop loss, testimony is limited to those crops harvested before trial, likely the 2019 and 2020 crop yields, and future crop loss estimates are excluded as speculative.

For these reasons the Sharpe Estimate and the related testimony of William Ontiveros is excluded.

### Naag Rao and Linda Atkinson

Spire argues that the Court should exclude the reports and testimony of experts Naag Rao and Linda Atkinson regarding construction damages, because Spire has a continuing obligation to address and resolve these types of issues under the FERC Certificate.  Therefore, their opinions will not help the Commissioners determine a fact in issue. (Doc. 474, 505.)  In response, both the Poggemoeller parcel and the Machens defendants argue their testimony is relevant and that Spire has completed its restoration efforts and that Spire's "ongoing duty to remediate" is (1) not a duty to "remediate," (2) not enforceable by the landowners, and (3) not ongoing. (Docs. 498, 522.)

Spire argues their expert testimony will not help the Commissioners determine a fact in issue due to Spire's ongoing obligation to address and resolve restoration. However, Spire notes there is no factually similar Missouri case regarding condemnation and post-construction monitoring obligations under FERC.  It cites a non-binding source, *Rover Pipeline, LLC v. 10.055 Acres of Land*, No. 5:17-CV-239, 2018 U.S. Dist. LEXIS

217574 (N.D. Ohio Dec. 28, 2018). (Doc. 453 at 11.)  Conversely, defendant argues the testimony is admissible and that *Rover* is distinguishable to this case.

As previously discussed, in *Rover*, the Ohio District Court excluded the soil expert's testimony because it would not help the trier of fact determine the facts in that case. *Rover* at *26-27.  Spire correctly states that *Rover* has many factual similarities to the instant case.  In that case, like here, the condemned property included a temporary easement and smaller permanent easement, the only remaining issue was limited to the amount of compensation, and a monitoring program adopted by the FERC potentially impacted the motion to exclude that soil expert's testimony. *Id*. at 16, 26-17.  That case turned on the FERC post-construction monitoring program; therefore, that court looked to the language of the FERC Certificate, the Agricultural Impact Mitigation Plan, and Rover's commitment to the landowners. *Id*. at 16-24.

In the instant case, as stated above, on January 26, 2017, Spire filed its application to construct the pipeline with FERC. (Docs. 475 at 5, 506 at 4.)  On August 3, 2018, FERC issued the Certificate authorizing Spire to proceed with the project, conditioned on "(3) Spire's compliance with the environmental conditions listed in the appendix to this order" which Spire identifies as FERC Environmental Condition Nos. 1 through 22 identified in the Certificate. (*Id*. at 6.)  Spire also cites various sections of the EA which is not included as an attachment here.  Lastly, Spire is required to provide quarterly reports documenting the results of follow-up inspections, including those identified by the landowners, and corrective actions taken for at least 2-years following construction. (*Id*. at VII.B.1-2 at 7-9.)

Defendant argues that *Rover* is distinguishable from the instant case, and the Court agrees in part.  In *Rover*, the natural gas company committed to:

> compensating agricultural landowners 'for a full 3 years (from the start of construction) of productivity on lands impacted by the construction' [and] [i]t also promised to continue to monitor crop yields for the first five years and compensate landowners if yield reduction in the described areas was higher than originally estimated.

*Rover* at *17-18.

Further, in that case, the district court noted that the Final Environmental Impact Statement ("FEIS") was initially critical of Rover's plan because it placed the burden on the landowner to report concerns. *Id*. at *19. Therefore, FEIS recommended that, prior to construction, "Rover should file . . . a 5-year post-construction monitoring program to elevate crop productivity in the areas impacted by the construction of the pipeline[,]" to put the onus on *Rover. See id*.  FERC granted Rover's application conditioned on Rover's compliance with certain environmental conditions and the filing of the five-year monitoring program. *Id*. at *20

Turning to the language in Spire's evidence in support of its motion, Spire notes its mitigation plan consists of FERC's guidelines as outlined in the *Upland Erosion Control, Revegetation, and Maintenance Plan*, *Wetland and Waterway Construction and Mitigation Procedures*, as well as "additional construction, restoration, and mitigation plans prepared specifically for the project[,]" and FERC Environmental Condition Nos. 1 through 22 identified in the Certificate (*See* Spire STL Pipeline Project Implementation Plan, FERC Docket Nos. CP17-40-000 and CP17-40-001 dated August 2018).

Spire did not commit to compensation and a long-term monitoring and restoration plan as Rover did.  The *Upland Erosion Control, Revegetation, and Maintenance Plan* and the *Wetland and Waterway Construction and Mitigation Procedures*, provided by Spire, are FERC documents which are generalized and not unique to Spire.   Spire references the *Upland Erosion Control, Revegetation, and Maintenance Plan,* Section VII.A.1 which outlines post-construction *Activities and Reporting, A. Monitoring and Maintenance*, including:

> "1. [Spire will] [c]onduct follow-up inspections of all disturbed areas, as necessary, to determine the success of revegetation and address landowner concerns.  At a minimum, conduct inspections after the first and second growing season[;]" [and,] "3. Monitor and correct problems with drainage and irrigation systems resulting from pipeline construction in agricultural areas until restoration is successful."

(*Upland Erosion Control, Revegetation, and Maintenance Plan*, May 2013 Version at 17.)

Spire's mitigation plan, in contrast to Rover's, focuses on an obligation to monitor.  Spires' commitment to the landowners, if any, is not clear.  For example, Rover *committed* to *compensating* landowners for a full three years and *promised* to continue to monitor crop yields for the first five years and c*ompensate* landowners.  Conversely here, the onus is not on Spire,.  Instead the applicable language merely requires follow-up inspections *as necessary* to *address* owner concerns, and quarterly reports including those issues *identified by the landowners*, and requires Spire to take *corrective actions* for at least two years, although it is unclear what those actions may be.

To the extent Spire references its compliance with the environmental conditions listed in the Appendix to the FERC Order, Environmental Condition Nos. 1 through 22, identified in the Certificate, Spire's commitment remains unclear and Condition Nos. 1 through 22 do not significantly apply to the landowners.  Generally, in Spire's words, if a *landowner reports* a concern Spire *will investigate* and *as necessary address* the landowner's concerns.  This language is not as definite as the clear compensation and commitment reviewed by the district court in *Rover*.

Defendants further argue that nothing in the FERC record ensures any "obligations" will be fulfilled in respect to the defendants or future purchasers. (Docs. 498 at 1, 522 at 2.)  The Court agrees.  However, Spire argues that the obligations under the FERC Certificate are legally enforceable under 15 U.S.C. § 717u.  However, the Commission--not the landowner--may bring action in this Court. (*See* Doc. 522 at 3.)  In *Columbia Gas Transmission LLC v. Singh*, the Sixth Circuit Court of Appeals opined,

> "First, as other circuits have recognized, the Natural Gas Act does not create a general private right of action to counter violations of the Act. *See Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold & Easement in the Cloverly Subterranean Geological Formation,* 524 F.3d 1090, 1100 (9th Cir. 2008); *Clark v. Gulf Oil Corp.,* 570 F.2d 1138, 1148 (3d Cir. 1977). The Natural Gas Act contains a narrow, explicit private right of action and a broad right of action for the government."

- 16 -

707 F.3d 583, 587 (6th Cir. 2013).  Even if the Court were to consider Spire's obligations to FERC as transferable or applicable to the landowners or property, as previously discussed herein, Spire has no actual "obligations" to remediate but merely a commitment to monitor and document, per Spire's self-assigned standards for a minimum of two years following construction.

Considering that Spire does not appear to have an obligation to complete further restoration[2] without burdening the landowners to submit ongoing complaints or further legal action leaving landowners with an unclear finality, the Court finds at least some adverse impacts can be discerned now.  Accordingly, the reports and testimony of Dr. Rao regarding soil damage and Ms. Atkinson regarding alleged construction damages is likely helpful to the fact finder.

### Dr. Rao and topic of additional damages

In its reply to defendants' opposition to the instant motion, Spire argues that Dr. Rao's conclusions concerning "additional damages" are not based on sufficient data and are not scientifically valid.  It argues that Dr. Rao's opinion regarding the loss of topsoil from the right of way on the Poggemoeller parcel and Machens parcel should be excluded. (Doc. 511, 528.)  Specifically, Spire argues that Dr. Rao's conclusions on (1) soil loss being based solely on personal observations, (2) the addition of worm cocoons which is purportedly unsupported by scientific literature and data, and (3) soil pH, bulk density, and drainage issues, merely point to "some difference[s]" which do not affect future outcomes on the parcels. (Docs. 511 at 10-14 and 528 at 14-19.)  Defendants argue that Dr. Rao's report is reliable and based on extensive experience. (Docs. 498, 522.)

---

[2] To the extent Spire claims that it cannot restore the ROW until after the 2020 growing season and harvest is complete at the time the Commissioner hears the instant case that restoration will have been complete according to Spire, in late 2020. (Doc. 485 at 8.)

Defendants argue that Dr. Rao is a highly qualified agricultural cost-to-cure expert.  The Court agrees.  Dr. Rao has extensive experience in agricultural studies and creating the type of report he created here. His education and experience include:

> 1. PH. D. in Crop Science/Weed Science from North Carolina State in 1993.
> 2. M.S. in Agronomy from the University of Agricultural Studies in Bangalore, India, in 1984.
> 3. B.S. in Agriculture from the University of Agricultural Studies in Bangalore, India in 1979[.]
> 4. Asst. Professor of Agronomy at the University of Agricultural Studies in Bangalore, India, from 1984-1989.
> 5. Sr. Research Assistant at North Carolina State University from 1992-1997[.]
> 6. He was identified as a Certified Crop Advisor by the American Society of Agronomy in 2000.
> 7. He was certified as a Technical Service Provider by the Natural Resources Conservation Services, an agency of the US Department of Agriculture in 2003.

(Docs. 498, Ex 3 and 522, Ex. 3.)  Dr. Rao has worked in the field of forensic agronomy, the science of soil management and crop production, for over 30 years and "specialize[s] in the diagnosis and amelioration of agricultural problems."  (*See* Doc 475, Ex. 5, Rao Dep. 269:3-4.)  He began his work as a forensic agronomist at MW Claims Service, LLC, where he produced over 600 cost-to-cure claims, and since 2007 he continues his work at ZeaMax Research. (*See* Doc. 498, Ex. 3.)

Defendants argue that Dr. Rao's conclusions are either based on his experience and visual inspections of the subject properties or reliable testing techniques.  During site visits to the Poggemoeller parcel and Machens parcel, Dr. Rao observed land contours with "holes, uneven surface, ponding due to improper backfilling, uneven surface with major depressions, [and] loss of topsoil." (Docs. 475, Ex. 4 at 9; 506, Ex. 5 at 11.)  He visited these parcels and others related to this pipeline multiple times, spoke with parcel owners, and made observations which would be easily visible to anyone with an agricultural background. (Doc. 498 at 19.)   Spire argues that Dr. Rao's topsoil conclusions are not supported by data (Doc. 511 at 11.)  However, "no one denies that an

expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. at 156.

In this case it is unlikely that the Commissioners who will hear the facts will be "confused" or "tricked" because the panel of Commissioners have been vetted by both parties and this Court. The selected individuals have deep condemnation knowledge, and appraisal experience or legal knowledge that qualify them to weigh proof of value in real estate. Therefore, confusion that might otherwise exist from the evidence is minimized here.

Calling Dr. Rao's worm cocoon findings "junk science," Spire argues that "Dr. Rao concedes that he cannot point to any scientific literature or data that supports the conclusion that adding worms to a large tract of agricultural property impacted by pipeline construction would have the effect of ameliorating the effects of construction." Defendants argue that his testimony is mischaracterized by Spire and that attacks on his conclusions go to the weight and not the admissibility of his testimony. (Docs. 498 at 22, 511 at 11.)   The Court agrees.   In support of Dr. Rao's conclusions that earthworms benefit the soil and should be used to cure the loss of topsoil and depressions, defendants point the Court to Dr. Rao's published workfile[3] and three scientific articles therein. (Doc. 498 at 22-23.)

As to Dr. Rao's credibility, Spire also argues Dr. Rao is not a biologist nor does he hold a specific certification in nematology.   However, he has comparable experience, in that he worked as a Nematology Program Lead with Monsanto during 1997-2007. (*Id*. at 24.)   "The extent of an expert's training or experience goes to the weight of his testimony and does not render the testimony incompetent." S*trong*, 261 S.W.3d at 513; *see also Robinson v. GEICO Gen. Ins. Co*. 447 F.3d 1096, 1101 (8th Cir. 2006) (generally gaps in an expert witness's qualifications or knowledge go to the weight of the witness testimony).

---

[3]   Dr. Rao's workfile can be accessed at https://drive.google.com /drive/folders /ImAGbUSX2GhvBtBKIMJ2oB48euSAUMkxr?usp=sharing.

Spire next argues that Dr. Rao's report and testimony regarding soil pH, bulk density, and drainage taken in April 2020 should be excluded as unreliable because his opinion merely indicates some difference in soil on and off the right-of-way without providing some information to suggest there will be any negative impact on the Poggemoeller parcel or Machens parcel. (*See* Docs. 506 at 16; 511 at 12-13.) Defendants' argue that Spire criticizes Dr. Rao's conclusions not his methodology or reliability of his testing.   Defendants note Dr. Rao describes the effect of crop productivity based on the cumulative factors in his report, but not to the level of certainty demanded by Spire. (Doc. 498 at 28.)   In *Wood River Pipeline Co. v. Sommer*, the Missouri Court of Appeals cautioned "[e]vidence of damages to reality is, by its very nature, speculative." 757 S.W.2d 265, 267 (Mo. Ct. App. 1988).

Lastly, it is unlikely that the wording "time will tell" or "educated guess", if deficiencies, in Mr. Rao's testimony would justify exclusion under Rule 702.  Since Mr. Rao has specialized knowledge that will help the trier of fact to understand the evidence, his testimony is based on sufficient facts, and his testimony is the product of reliable principles to which he applied to the facts of the case, Mr. Rao is not excluded as an expert witness.

## Ms. Atkinson and loss in value and additional loss in value

Spire next argues that Ms. Atkinson's valuation on "loss in value" and "additional loss in value" should be excluded because it is based on insufficient facts or data. (Docs. 475 at 26, 506 at 26.)  In response, defendants argue Ms. Atkinson is highly qualified and that any disagreement goes to the weight of her testimony's credibility, not its admissibility. (*See* Docs. 489 at 31-35, 522 at 32-42.)

As to loss of value, which refers to a "stigma" resulting from a perceived negative market due the existence of a pipeline on the subject property, Spire supports its argument with *Wood River,* 757 S.W.2d at 268.  In that case the trial court assessed the landowner's qualifications as an expert and the landowner's "fears," that were the basis for her loss in value calculations, due to a  nearby pipeline being replaced which could

result in leakage and ground contamination and a pipeline across from the owner's parcel that had been broken. *Id*.  That case differs from this one, in that Ms. Atkinson is not the landowner but an experienced appraiser basing her conclusions, defendants' argue, on stigma, not fear.

Conversely defendants support their position with *Missouri Pipeline Company v. Wilmes,* 898 S.W.2d 682 (Mo. Ct. App. 1995).  Similar to *Wood River*, in *Wilmes* that court considered the owner's "fear," which is not at issue here, and that court also analyzed the admissibility of an experienced professional appraiser who, like here, considered the effect of stigma on the subject parcels. *See id*. at 688.  The Missouri Court of Appeals, in *Wilmes*, identified the standard for diminution of value:

> An expert's opinion must be founded upon substantial information, not mere conjecture or speculation, and there must be a rational basis for the opinion. . . .  [B]ased on his review and his experience as a real estate appraiser in St. Charles County, Defendant's property was worth 25% less after the taking than before, met these requirements.

*Id*. at 682.  Accordingly, that court admitted the testimony of an appraiser with 30 years' experience, who was familiar with the real estate in St. Charles County and that defendant's property, and who believed the value of that defendant's property was diminish by 25%, despite the fact that he had merely viewed the property from the road and reviewed where the pipeline would cross the property on a map. *See id*. at 687.

Similarly, Ms. Atkinson has appraised property in the St. Louis area for twenty-eight years, has performed four pipeline appraisals on this pipeline project, has appraised large tracts of farmland, is licensed in 10-15 states, and worked on behalf of Keystone Pipeline in performing a market study of agricultural sales across the Midwest.  (Docs. 475, Ex. 7; 475, Ex. 8 at 5; 475, Ex. 8, Atkinson dep. 19:1-7.)

To support her conclusions in this case Ms. Atkinson relied on a 2020 study titled *The Impact of a Natural Gas Pipeline on Property Values* ("Impact Study") which performed a comparable sales analysis of properties with natural gas pipelines and without, and concluded that the natural gas pipelines resulted in an overall impact on the property between +2% and -32%. (Doc. 475, Ex. 7, Addenda E.)  Spire argues the Impact

- 21 -

Study is not specific to St. Charles.  However, Ms. Atkinson spoke with the author of the study and then consulted with broker Jason Cleveland, a broker with Trophy Properties and Auctions in Ballwin, Missouri, who concluded in his experience in selling farmland encumbered with pipelines, that pipelines caused around $200/acre in damages to farmland values. (Doc. 475, Ex. 8, Atkinson Dep. 91:24-92:8.)   Ms. Atkinson then incorporated that study into her own appraisal and concluded a 11% discount on the Poggemoeller parcel. (Doc. 475, Ex. 7 at 21.)  The Court is satisfied that Ms. Atkinson's opinion as to loss in value is supported by adequate research, studies, and expertise.

Spire argues that Ms. Atkinson's "additional loss in value" opinions are inadmissible because they rely on Dr. Rao's cost-to-cure estimate.  However, the Court has already found Dr. Rao's reports and testimony admissible.  Dr. Rao's purpose in this litigation is to provide Ms. Atkinson with an estimate of the "costs-to cure" to fix the construction related issues on defendants' properties. (Doc. 498 at 16.)  Ms. Atkinson's purpose is to supply an opinion on the diminution in value of the subject parcels because of these issues. (*Id*. at footnote 6.)  Therefore, Ms. Atkinson is not opining on the cost-to-cure the property but rather the on the diminution of value caused by the construction.  Accordingly, Ms. Atkinson's opinions on additional loss in value are admissible.

Turning to crop loss, although mitigation in *Rover* is distinguishable here, the reasoning in *Rover* applies to crop loss in this case.  Further, the Missouri Supreme Court explained that "loss of profits is usually regarded as too speculative and remote to be considered as a basis for ascertaining the damages in a condemnation proceeding." *State ex rel. Kansas City Power & Light Co. v. Salmark Home Builders, Inc.*, 375, S.W.2d 92. 98-99 (Mo. Ct. App. 1997).   In the instant case, the Commissioners cannot now know if the future crop yields will be affected or if any crop loss will occur.  Accordingly, crop-yield data and opinions are only admissible to the extent that they cover all available growing season data as of the Commission hearing but not future "speculative" crop loss.

Lastly, Spire seeks to exclude Ms. Atkinson's references to its prior offers to purchase the easement on the Poggemoeller parcel.  (Doc. 475 at 30-31.)  The Court declines to reach the merits of the argument, but excludes the testimony as irrelevant,

because Ms. Atkinson confirmed she did not rely on this property history information to support her after-value conclusions. (See Doc. 475, Ex. 8 Atkinson Dep. 143:13-25.)

### Corey Sell

Defendants Schaeffer, Poggemoeller, and Machens all similarly argue that the Court should exclude the reports and testimony of appraiser Cory Sell because his analysis and conclusions are unreliable and irrelevant. (Docs. 455, 493, and 504.)   In response, Spire argues that the defendants' challenges go to the weight of Mr. Sell's testimony, not to admissibility. (Doc. 462 at 2.)

As an initial matter, Mr. Sell's appraisal report included critical value conclusions: (1) the value of the permanent easement; (2) the value of the temporary easement; and (3) damage to the remainder as a result of the pipeline. (*See e.g.*, Doc. 456 at 3.)  Defendants do not challenge Mr. Sell's qualifications as an expert real estate appraiser, do not challenge Mr. Sell's reliance on comparable sales or underlying appraisal methodology, do not challenge Mr. Sell's valuation of the Schaeffer parcel before the imposition of the easements, do not challenge Mr. Sell's value of the permanent easement, and do not challenge Mr. Sell's valuation of the temporary easements.   Nevertheless, defendants argue Mr. Sell's testimony should be excluded because he (a) relied on an unsigned easement agreement to determine the rights and obligations of the parties, (b) allegedly failed to comply with the Uniform Standards of Professional Appraisal Practice ("USPAP"), and (c) found zero damages to the remainder. (Docs. 456 at 3, 477 at 3-11, 504 at 3-14.)

Defendants argue that Mr. Sell relied on the unexecuted easement agreement to determine the rights impacted by the pipeline.[4]   However, in valuing the permanent

---

[4] In Doc. 462, footnote 1, Spire notes "[d]efendant misrepresents the actual record in this proceeding. Mr. Sell testified a third party provided him with the easement agreement to prepare an initial appraisal for use in pre-suit settlement negotiations with the landowners. Deft's Exhibit 2, 20:18 to 21:5, 28:15-20. The draft report was prepared in November 2017 and never finalized. *Id.* at 21:6-9, 21:17-24, 22:14-19. After Spire commenced this condemnation proceeding, Mr. Sell appraised the Schaeffer parcel again

easement, Mr. Sell did not solely rely on the unexecuted easement agreement to determine the rights impacted by the pipeline. He also considered the easement plat, legal descriptions of the easements, present use of the easement area, future use of the easement area, building and zoning restrictions, access considerations, market perception as reported by participants, and the remaining use and utility of the property within the easement area. (Doc. 455, Ex. 1 at 21-23, 27.)

Defendants also argue that Missouri law "maximum injury rule" requires, in the absence of express provisions regarding the rights acquired in an eminent domain proceeding, that the trier of fact must assume the "most injurious" use of the premises. *State ex Rel Hwy. & Tr. Com'n v. Cowger*, 383 S.W.2d 144, 146-47 (Mo. Ct. App. 1992). The maximum injury rule does not apply in this case, because "the maximum injury rule is used only in the ***absence*** of detailed construction plans which limit the condemnor." *Id.* (emphasis original).  In *Cowger*, the appellate court explained that the maximum injury rule did not apply in *Cowger* because "the design plans were entered into evidence without objection, and show the nature and extent of the land taken and the location of the highway improvement to the remaining property. . . ." *Id.* at 147.  In the instant case, Spire first notes it will present evidence at the Commission hearing detailing the nature and extent of the land taken and rights of the parties in and to the easement.[5]  Further, Spire attached the FERC Certificate to its Complaint. (*See* Doc. 1, Ex. 1.)  The FERC Certificate identifies Spire's FERC Application with detailed construction plans, Environmental Assessment, and the *Upland Erosion Control, Revegetation, and Maintenance Plan*.  Together, these documents detail the scope of the construction

and issued an appraisal in the form of Deft's Exhibit 1 in February 2020. Mr. Sell did not include the unexecuted easement agreement with the February Appraisal."

[5] In Doc. 463, footnote 3, Spire notes: Spire requested the Court to enter a Final Order and Judgment of Condemnation on January 31, 2020. *See* Doc. 379. The proposed Final Order and Judgment of Condemnation set forth the interests acquired and Spire's rights to the easement.  However, Defendant objected to Spire's request. *See* Doc. 399. Thus, there has been no  entry of a Final Order and Judgment of Condemnation.

project, easements necessary for the completion of the project, Spire's post-construction obligations with regard to restoration, monitoring and revegetation, and, if any, the rights of the landowners following installation of the pipeline.   As previously discussed in this opinion, the Commissioners in this case are experienced and knowledgeable, and will, as the trier of fact consider all the evidence to determine whether the "maximum injury rule" should apply.   Further, an expert opinion is relevant if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Rule 702.   Here, defendant only challenges Mr. Sell's opinions based on relevance.   That argument is without merit.

Defendants next argue that Mr. Sell's opinion is unreliable because he found zero damages to the remainder without factual support and because that conclusion is no longer accepted by the relevant community. (Docs. 456 at 7, 477 at 7, 504 at 9.) Defendants argue it was improper for Mr. Sell to assume, based on the unexecuted easement agreement, that Spire would "restore the surface of the ground disturbed by their use of the permanent easement and temporary work space areas, whether during initial construction or later, to substantially the same condition as its prior condition." (*See* Doc. 462 at 6.)   During deposition, counsel asked Mr. Sell "[i]f the easement agreement had not been signed would [his] statement about restoration still be accurate" to which he responded "Yes, because it's the intention of Spire." (Id., Ex. 2, Sell Dep. 54: 10-14.)   Therefore, Mr. Sell's opinion is consistent with Spire's legal obligation expressed in the FERC Certificate and related mitigation plans.[6]

Defendants also offer multiple peer-review articles and cases finding diminution of property value due to the presence of a pipeline, noting that Mr. Sell's findings deviate from a "general and growing consensus" that partial takings have an impact on the remainder.   The Court finds that a "growing consensus" in a community is not consistent with defendants' argument that Mr. Sell's opinion is "no longer accepted" in the relevant

---

[6] Spire has no clear obligation directly to the homeowners expressed in the FERC Certificate, while it does have a legally enforceable obligation to the issuing authority under the FERC Certificate.   Therefore, it is not unreasonable for Mr. Sell to use that obligation in forming his expert opinions.

community.   Spire concedes that a property subject to an easement is burdened. However, the Court finds that whether damage to the remainder exists is determined on a case-by-case basis. (Doc. 462 at 8.)

Mr. Don Sherwood, author of a peer-reviewed article contained in Mr. Sell's report, included factors important to deterring damage to the remainder, most notably, whether the taking effects the highest and best use of the property. (Doc. 455, Ex 7(b) at 4, *The Valuation of Easements*.)   In further support of Mr. Sell's opinion, he explained "based on our knowledge, experience, review of peer-published studies, regarding the impact of pipeline easements on property values . . . we do not believe the value of the area outside the easement is diminished to any extent by the location of the easement area relative to the are outside the easement. Despite the location of the proposed permanent easement, the subject property can continue to be utilized for agricultural purposes[,]" including the highest and best use of the parcels. (Docs. 455. Ex. 1 at 29; 462 at 6-7.)   In addition, defendants' appraiser Ms. Howard conceded that the presence of a pipeline on property in north St. Charles County does not affect market value which supports Mr. Sell's conclusion that there is no damage to the remainder. (*See* Doc. 465, Ex. 1, Howard Dep. 65:8 to 66:5.)   Accordingly, Mr. Sell's opinion is reliable.

Lastly, defendants argue that Mr. Sell's opinion is unreliable because he did not disclose an extraordinary assumption, that Spire would fully restore the property, in violation of USPAP.[7] (Doc. 456 at 9.)   In *Whitehouse Hotel L.P. v. Comm'r*, 615 F.3d 321, 332 (5th Cir. 2010), the Court of Appeals for the Fifth Circuit explained compliance with USPAP is "relevant to the weight" of the expert's opinion, not admissibility.   Here, the Court cannot say, given Spire's legal obligation to restore the property under the FERC certificate, that Mr. Sell made an extraordinary assumption.   However, even assuming he did make an extraordinary assumption, strict compliance with USPAP is not a precondition to admissibility and any concern goes to the weight of his testimony.

---

[7] In Docs. 477 and 504, defendants Poggemoeller and Machens incorporate the Doc. 456 arguments. (Docs. 477 at 12, 504 at 14).

Mr. Sell's testimony is sufficiently reliable and relevant to be admissible.

### **Aaron DeJoia**

Defendant Poggemoeller argues that the Court should exclude the rebuttal reports and testimony of expert Aaron DeJoia regarding the opinions and conclusions of Construction Damage expert Dr. Rao, because Mr. DeJoia's has little personal understanding of the subject property and his opinion is based on incomplete data (Doc. 490.)   In response, Spire argues that defendant does not challenge Mr. DeJoia's qualification as a soil expert and agronomist, and that Mr. DeJoia's rebuttal testimony is highly relevant to the reliability of Dr. Rao's report. (Doc. 509 at 2.)

Defendant first argues Mr. DeJoia's expert testimony will not help the Commissioners determine a fact in issue because the report is based on observations Mr. DeJoia did not make and testing he did not perform. (Doc. 490 at 1.)  Conversely, Spire argues that Mr. DeJoia is qualified to critique Dr. Rao's findings and conclusions because courts regularly permit experts to testify at trial regarding the reliability of the opinions of opposing experts and those rebuttal experts need not offer their own independent theories or conclusions. (Doc. 509 at 1.)

Mr. DeJoia is a Certified Professional Soil Scientist, a Certified Agronomist, a Certified Crop Advisor, a North Dakota Professional Soil Classifier with twenty years of experience working as a soil science consultant for international and domestic clients, and he has worked on numerous pipeline reclamation projects throughout the United States. (Doc. 509, Ex. 1.)  In addition, Mr. DeJoia has co-authored numerous journal articles in the area of soil science, agronomy, and reclamation of agricultural property and has performed over 10,000 acres of agricultural right-of-way inspections and mapped over 20,000 acres of soil to identify soil structure and impact of crop growth. (Doc. 509, Ex. 2, DeJoia Dep. 114:21 to 115:2.)  Accordingly, the Court finds he is qualified to act as a rebuttal witness.

To the extent defendant argues Mr. DeJoia did not visit the Poggemoeller parcel in person or his underlying data is incomplete, Mr. DeJoia's opinions concerning the alleged

flaws in Dr. Rao's testing methods and conclusions are supported by facts even though they are, in part, based on the facts presented in Dr. Rao's report.  As defendant points out, Mr. DeJoia based his conclusions on his own expertise and relied on the following information:

> **4.0 Data and Information Relied Upon**
> In addition to my education, training, and 20 years of professional experience in soil science and reclamation work, I have relied on the following information and data to form my opinions in this report:
> - Reports submitted by Rao for the Poggemoeller property dated January 30, 2020 (Preliminary Report); March 15, 2020 (Interim Report); and Closing Report dated May 11, 2020.
> - Pre-construction topsoil estimates and interpolated results obtained for Spire (December 2018).
>  - United States Department of Agriculture (USDA) Natural Resource Conservation Services (NRCS) soil survey maps for St. Charles County, Missouri.
> - USDA-NRCS Official Soil Series Descriptions for soils mapped on the Property.
> - Peer reviewed scientific journal articles.
> - Scholarly soil science and agronomic textbooks.
> - Deposition transcript of Dr. Rao.
> - Other pertinent pleadings (including, without limitation, the Complaint), discovery materials, remediation estimates/bids, and other case information.

(Doc. 490, Ex. 1 at 4.)  In formulating his opinions on crop loss, Mr. DeJoia relied on Poggemoeller's crop insurance documents prepared for the 2020 growing season which contains 10-years of historical crop yield data.  As previously addressed by the Court throughout this opinion, crop-yield data and opinions are only admissible to the extent that they cover all available growing season data as of the trial but not for future "speculative" crop loss.  Defendants' argument that the data and personal knowledge Mr. DeJoia relied upon are legally insufficient goes to the weight of the testimony and not its admissibility.

"The function of rebuttal testimony is to explain, repel, counteract, or disprove evidence of the adversary party.  As such, rebuttal evidence may be used to challenge the evidence or theory of an opponent – and not to establish case-in-chief." *Marmo v. Tyson*

*Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) (internal citations omitted).  This District Court has accepted that "'[a] number of other district courts have held that rebuttal expert witnesses may criticize other experts' theories and calculations without offering alternatives.' (denying the motion to exclude expert testimony under Rule 702). Moreover, the [c]ourt holds that [the expert's] alleged failure to test his theories goes to the credibility of his testimony, not his admissibility and does not require exclusion in a case such as this." *Conner v. WW Indus. Corp.*, 2018 WL 2744978 at *4 (E. D. Mo. June 7, 2018) (internal citation omitted).

Any argued deficiencies in Mr. DeJoia's testing or lack of knowledge goes to his credibility, not the admissibility of his testimony.

## CONCLUSION

For these reasons,

**IT IS HEREBY ORDERED** that plaintiff's motion to exclude the testimony of defendants' experts Gerald Berning, Donna Howard, and William Ontiveros (Doc. 452) is **granted as to the topics of future crop loss and cost to cure, and the testimony of William Ontiveros and the Sharpe Report.  In all other respects the motion is denied.**

**IT IS FURTHER ORDERED** that plaintiff's motions to exclude the testimony of defendants' expert Linda Atkinson and Dr. Naag Rao (Docs. 474, 505) **are sustained as to the topics of future crop loss and Spire's prior offers to settle.  In all other respects the motions are denied.**

**IT IS FURTHER ORDERED** that the motion of defendant Virginia Schaffer and the Schaffer Trust to exclude the opinion of plaintiff's expert witness appraiser Cory Sell (Doc. 455) **is denied, subject to the prohibition of evidence regarding future crop loss.**

**IT IS FURTHER ORDERED** that the motion of defendant Alan and Sharon Poggemoeller to exclude the opinion of plaintiff's expert witness appraiser Cory Sell

(Doc. 477) **is denied, subject to the prohibition of evidence regarding future crop loss.**

**IT IS FURTHER ORDERED** that motion of defendants Kevin and Shelley Machens to exclude the opinion of plaintiff's expert witness appraiser Cory Sell (Doc. 504) **is denied, subject to the prohibition of evidence regarding future crop loss.**

**IT IS FURTHER ORDERED** that the motion of defendants Alan and Sharon Poggemoeller to exclude the opinion of plaintiff's expert witness Aaron DeJoia (Doc. 490) **is denied, subject to the prohibition of evidence regarding future crop loss.**


　　　　　　　　　　　　　　**/s/   David D. Noce**
　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**

Signed on March 5, 2021.