## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| SPIRE STL PIPELINE LLC, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:18-CV-1327 SRC/DDN |
| | ) | |
| 3.31 ACRES OF LAND, et cet., et al., | ) | |
| | ) | |
| Defendant(s). | ) | |

## REPORT AND RECOMMENDATIONS OF THE COMMISSION TO DETERMINE JUST COMPENSATION

(Alan Poggemoeller and Sharon Poggemoeller-Tract No. MO-SC 307.000)

## I.    INTRODUCTION

This is an eminent domain case filed by plaintiff Spire STL Pipeline LLC (hereinafter "Spire"). Under the Natural Gas Act, Spire has the authority to take an easement on private property for the purpose of constructing a natural gas pipeline on various parcels of real estate. The Court appointed this Commission pursuant to Federal Rule of Civil Procedure 71.1(h)(2) to determine the just compensation payable by Spire to each defendant. The subject of this Report and Recommendation is the Alan and Sharon Poggemoeller property, also known as Tract No. MO-SC 307.000. The Court held an evidentiary hearing on July 26-30, 2021, which all the commissioners attended in-person or remotely. At the beginning of the hearing, and at the conclusion, the Court instructed the Commission as to its duties by reading aloud to the Commissioners the Final Commission Instructions for Poggemoeller and Machens Hearing (the "Commission Instructions"). The Court also provided to each Commissioner a copy of the Commission Instructions. In conducting its deliberations, the Commission adhered to the Commission Instructions. Those instructions can be found on the Court's docket.

1

Having considered carefully all of the evidence and testimony offered by the parties, the Commission now unanimously recommends the Court order Spire to pay compensation to the defendants Alan Poggemoeller and Sharon Poggemoeller as set forth in this report and as summarized in **Exhibit A**, incorporated herein.  The Commission makes the following findings in accordance with Rule 71.1(h)(2)(D).

## II.     RELEVANT STANDARD FOR JUST COMPENSATION

Pursuant to the Commission Instructions, the Commission determined just compensation by finding the difference between the fair market value of the entire property immediately before it was taken on December 17, 2018, and the fair market value of remaining property immediately after the taking on December 17, 2018. In determining the fair market value, the Commission relied on the highest and best use of the property, meaning the most profitable and advantageous use the owner may make of the property interest, even if the property interest is presently used for a different purpose or is vacant, so long as there is a market demand for such use.

As the Court instructed, under Missouri law, the defendant landowner has the burden of proving by the greater weight of the evidence the amount of just compensation to which the landowner is entitled. This means the landowner has the burden of causing the Commission to believe that the respective proposition is more likely true than not true.

Under the Natural Gas Act, §717f(h), the law of the state in which the condemned property is located is used for determining just compensation. Therefore, even though condemnation under the Natural Gas Act is a matter of federal law, Missouri law is applied in determining just compensation.

**A.**     **Just Compensation Standard in Missouri**.

The meaning of just compensation in Missouri is thoroughly discussed in the Missouri

Supreme Court decision of *City of St. Louis v. Union Quarry & Construction Company*, 394

S.W.2d 300 (Mo. 1965).  In that decision, the court stated:

> The ultimate objective in this case, as in all condemnation cases, is to enforce the
> constitutional mandate 'That private property shall not be taken or damaged for public
> use without just compensation.' Constitution, Art. I, § 26. 'Just compensation' means
> the full and perfect equivalent in money of the property taken, Clark v. United States,
> 8 Cir., 155 F.2d 157, but no more, for to award more than the value of the condemned
> property would result in the unjust enrichment of the condemnee. State ex rel. State
> Highway Commission v. Hackett, Mo.App., 370 S.W.2d 712. The 'just compensation'
> referred to, generally speaking, is the 'fair market value' of the property at the time of
> the taking. Union Electric Co. v. Saale, Mo.Sup., 377 S.W.2d 427[1]; Union Electric
> Co. v. Pfarr, Mo.Sup., 375 S.W.2d 1; 4 Nichols on Eminent Domain, 3rd ed., § 12.2.
> The fair market value of land is what a reasonable buyer would give who was willing
> but did not have to purchase, and what a seller would take who was willing but did
> not have to sell. Union Electric Co. v. Saale, supra, 377 S.W.2d, l. c. 429. The
> landowner is entitled to the fair market value of the land at its highest and best
> use, City of St. Louis v. Vasquez, Mo.Sup., 341 S.W.2d 839;  and in determining what
> constitutes the fair market value the uses of the land for which it is reasonably adapted
> or suited may be considered, including a special adaptation for a particular use, North
> Kansas City School Dist. of Clay County v. J. A. Peterson-Renner, Inc., Mo.Sup., 369
> S.W.2d 159, 164, having regard to the existing business wants of the community.
> Union Electric Co. v. Saale, supra. If such peculiar adaptation adds to its value, the
> owner is entitled to the benefit of it. 29A C.J.S. Eminent Domain § 160. In determining
> fair market value each case must be considered in the light of its own facts, not on the
> basis of some artificial rule, but of sound judgment and discretion on a consideration
> of all relevant circumstances. 29A C.J.S. Eminent Domain § 136(5). *394 S.W.2d 302.*

**B.**     **Commission Instructions.** Additionally, the Commission followed and applied the

Commission Instructions, § T, in determining just compensation and fair market value.

**C.**     **Fair Market Value-Definition**.

Mo. Rev. Stat. §523.001(1) defines "fair market value" as:

>          **523.001. Definitions. —** For the purposes of this chapter, the
> following terms shall mean:

3

(1) **"Fair market value"**, the value of the property taken after considering comparable sales in the area, capitalization of income, and replacement cost less depreciation, singularly or in combination, as appropriate, and additionally considering the value of the property based upon its highest and best use, using generally accepted appraisal practices.  If less than the entire property is taken, fair market value shall mean the difference between the fair market value of the entire property immediately prior to the taking and the fair market value of the remaining or burdened property immediately after the taking.

C.      <u>Stigma Damage-Fear of a Hazard</u>.

In *Missouri Pipeline Company v. Wilmes*, 898 S.W.2d 682 (1995), the court held that the testimony by a landowner's appraisal expert, stating that a gas pipeline on the property would diminish the value of that property by 25%, was not too speculative, and utilized an appropriate measure of damages, where that expert had 30 years' experience as an appraiser, had viewed the subject property, and was familiar with real estate in the County.  Further, federal courts have similarly allowed evidence of diminution in value caused by fear of a hazard which is incident to the use appropriated:

> Severance damages incorporate any "'injury due to the use to which the part appropriated is to be devoted[,]'" including "the hazards incident to [the proposed] use of the property taken[.]" *West Virginia Pulp*, 200 F.2d at 102 (citations omitted). "If fear of a hazard would affect the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller, diminution in value caused by that fear may be recoverable as just compensation. However, severance damages based wholly on speculation and conjecture are precluded." *Tenn. Gas. Pipeline Co.*, 2014 WL 690700 at *12 (citations omitted).
>
> *Columbia Gas Transmission, LLC v. 252.071 Acres in Balt. Cnty.*, Civil Case No. ELH-15-3462, 5 (D. Md. Dec. 8, 2016)

D.      <u>Maximum Injury Rule</u>.

The Commission takes note of the maximum injury rule and that it must make a determination as to whether it applies in this case. Under the maximum injury rule, the jury (or in this case the Commission) must base its verdict or decision on the most injurious use to which the property could be lawfully applied unless detailed construction plans which show the limits of the

4

condemnation are received into evidence. *State ex Rel Hwy. & Tr. Com'n v. Cowger*, 838 S.W.2d 144 (Mo. Ct. App. 1992). In *Cowger*, the court found that the maximum injury rule only applies in the absence of detailed construction plans which limit the condemnation. In that case, the highway design plans were received into evidence. Those plans showed the nature and extent of the property being taken and showed the location of the highway improvements. In the present case Spire offered into evidence the detailed Construction Plans for the Poggemoeller tract (Plaintiff's Ex. 21).  Further,  the Upland Erosion Control Revegetation and Maintenance Plan, Section IV. A, contains strict limitations which define the approved areas of project related construction and restoration ground disturbance permitted by the project. (Plaintiff's Ex. 3, p. 7.) Finally, on April 30, 2020 Plaintiff released the full width of the right-of-way for use in full farming operations, including tillage, fertilizing, planting and harvesting, in accordance with Section A.8.5 of the Environmental Assessment.   (Plaintiff's Ex. 53.)   All of this evidence illustrates in detail the scope of the easements, the nature and extent of the land taken and the location of the pipeline.  Therefore, the Commission finds that the maximum injury rule does not apply in this case.

## III.    RELEVANT STANDARDS FOR RESTORATION OF THE PROPERTY

The Commission Instructions, Section V., require that if the Commission believes additional restoration of the property is necessary to return the property to the pre-taking condition, then, when determining the damages due to a defendant for the taking of the permanent and temporary easements by Spire, the Commission must make a separate finding of what amount of money will be necessary to restore the property to the pre-taking condition. This amount must not be included in the amount of just compensation to which the Commission finds the landowner is otherwise entitled. Further, for purposes of determining the costs to restore the properties under

Section V, the Commissioners must not increase, decrease, and/or otherwise consider any future restoration or reclamation, regardless of any activity by the Federal Energy Regulatory Commission, by plaintiff Spire, or by the defendant landowners. Finally, the Commission must consider the condition of the properties only as of the date the case is submitted to the Commission for decision-making. That date was July 30, 2021.

In determining this, the Commission considered whether there is a difference in the property from the pre-taking condition to the after-taking and after construction condition. This amount, if any, is not included in the amount of just compensation, but is a separate recommendation for an award.

The Commission reviewed the Spire STL Pipeline Project Environmental Assessment (the "EA"), prepared by the staff of the Federal Energy Regulatory Commission (FERC) dated September, 2017. (Plaintiff's Ex. 2.) The Commission takes notice of the EA including section A.8.1-General Pipeline Construction Procedures, the provisions applicable to actively cultivated cropland and the provisions of section A.8.2-Special Pipeline Construction Procedures, as those relate to agricultural areas as described in section A.8.2, under the subsection titled "Agricultural Areas". The Commission notes that the Missouri Department of Agriculture does not require an Agricultural Impact Mitigation Agreement (AIMA), and therefore construction and restoration on agricultural land in Missouri is to completed in accordance with the Plan. The Plan is defined in the EA as the Upland Erosion Control, Revegetation, and Maintenance Plan, (herein the "Plan"). (Plaintiff's Ex. 3.)

The Commission has also reviewed the Spire STL Pipeline Project Implementation Plan dated August, 2018 (hereinafter the "Implementation Plan"). (Plaintiff's Ex. 4.) The Commission finds that pursuant to FERC Environmental Condition No. 1, Spire shall follow the construction

procedures and mitigation measures described in its application and supplements (including responses to staff data requests) and as identified in the EA.  Further, the Commission finds that pursuant to FERC Environmental Condition No. 6, the Project will adhere to the FERC's Upland Erosion Control, Revegetation and Maintenance Plan.[1]

In reviewing the complaints filed by the defendants in this matter relating to restoration, the Commission has applied the provisions of the EA, the Plan and the Implementation Plan in determining whether Spire has properly restored the property of defendants in accordance with the standards set forth therein.

## IV.    FINDINGS OF FACT

After deliberations by all of the Commissioners, the Commission makes the following findings of fact:

1.      The date of taking of the Poggemoeller property is December 17, 2018.

2.      The highest and best use of the property before the taking is agricultural. The highest and best use of the property after the taking is agricultural.

3.      The total acreage of the property before taking is 123.57 acres.

4.      The total fair market value of the entire parcel (land) before the taking is $1,235,700.00 and the total value of the improvements is $00.00, for a total value of the entire parcel with improvements before the taking of $1,235,700.00.

5.      The permanent easement taken is 2.63 acres.

---

[1] Pursuant to the Commission Instructions, §V, the Commissioners must not consider any future obligation for restoration or remediation by plaintiff Spire, the Federal Regulatory Commission, or the defendant landowners. Therefore, when considering the issue of whether additional restoration of the property is necessary to return the property to pre-taking condition, the Commission did not consider any future obligation for restoration or remediation by Spire, the Federal Regulatory Commission, or the defendant landowners, and the Commission considered the condition of the property only as of the date the case was submitted to the Commission for decision-making.

6.      The temporary workspace easement is 2.10 acres.

7.      The additional temporary workspace easement is 1.950 acres.

7.      The total fair market value of the entire parcel with improvements after taking is

$1,187,842.00.

8.      The Commission's calculation is set forth below.

## IV.      DETERMINATION OF JUST COMPENSATION

### Land and Improvements-Value Before Taking

| Description | Size | $ Per Acre | Total |
|---|---|---|---|
| Entire Parcel (land) | 123.57 | $10,000.00 | $1,235,700.00 |
| Improvements | n/a | n/a | $00.00 |
| **Total Value** (Before Taking) | | | **$1,235,700.00** |

### Land and Improvements-Value After Taking

| Description | Size | $ Per Acre | Total |
|---|---|---|---|
| Entire Parcel (land) less 2.63 acres | 120.94 | $9,800.00 | $1,185,212.00 |
| Permanent Easement Area | 2.63 | $1,000.00 | $2,630.00 |
| Improvements | n/a | n/a | $00.00 |
| **Total Value** (After Taking) | | | **$1,187,842.00** |

### Temporary Workspace Easement and Add. Temporary Workspace Easement

| Description | Size | $ Per Acre | Rental Rate | Term | Total |
|---|---|---|---|---|---|
| Temporary W.S Easement | 2.100 | $10,000.00 | 20% | 2 Yr. | $8,400.00 |
| Add. Temp. W.S. Easement | 1.950 | $10,000.00 | 20% | 2Yr. | $7,800.00 |
| **Total** | | | | | **$16,200.00** |

### Recapitulation of Just Compensation

| | |
|---|---|
| Value of Permanent Pipeline Easement | $23,670.00 |
| Total Market Rent for Temporary Easements | $16,200.00 |
| Loss of Value to 120.94 Remainder | $24,188.00 |
| **Total Just Compensation** | **$64,058.00** |

The Commission finds the reasonable value of total just compensation is $64,058.00.[2] The Commission came to this decision as follows.

## Appraisal Experts

The Commission finds that the reasonable value of the land is $10,000.00 per acre. In addition to other evidence, the Commission relied on the comparable sales presented by plaintiff's expert appraiser Corey Sell, with particular attention placed on Comparable No. 1 in his appraisal report. This property was valued at $10,136.00 per acre, and had one ammonium pipeline and one gas pipeline present on the property. Comparable sale No.1 also had 94% tillable ground and was within close proximity to the subject property. The Commission also finds that comparable sale No. 6, set forth in the appraisal report of Corey Sell, is comparable to the subject property, in that it is located approximately one mile from the subject property. (Plaintiff's Ex. 24.)

Additionally, in the appraisal report of defendant's expert appraiser, Linda Atkinson, the comparable sales described therein had an average sale price of $10,135.00 per acre.  Ms. Atkinson concludes that the value of  the subject property is $10,100.00 per acre.  (Defendant's Ex. Y.)

After hearing all of the evidence and reviewing the reports, the Commission concludes that the pre-taking value of the property per acre is $10,000.00. [3]

The Commission finds that the rental rate for calculating the total market rent for the temporary easements should be 20%, after taking consideration of all of the evidence presented. With regard to this finding, the Commission found that the rental rate of 10% shown in the appraisal report of Corey Sell only minimally compensates a landowner for the loss of use of the

---

[2] The Commission's finding and recommendations of just compensation is separate and apart from the findings and recommendations relating to the Cost to Cure, which is contained in Section V of this report.

[3] The Commission had little difficulty reaching a consensus as to the value of the real property on a per acre basis pre-taking. The plaintiffs appraiser valued the property at $9,500.00 per acre and the defendants appraiser valued the property at $10,100.00 per acre, which is a difference of only approximately 6%.

temporary easement area and that a 20% rental rate is more appropriate to adequately compensate the landowner. [4]

The Commission found that both appraisers were highly qualified to testify as to the value of the subject properties before and after the taking. As noted earlier, their determinations as to the value of the property before the taking and their calculations relating to the compensation to be paid for the temporary easements are reasonably similar. However, their opinions on damage to the remainder, stigma damages, loss of value and additional loss of value differ greatly.

Corey Sell Appraisal and Testimony.  Mr. Sell testified that the construction of the new pipeline on the subject property did not affect the use of the property for its highest and best use, which is agricultural. In his report, he concludes that "in order to derive our estimate of percentage of property rights taken within the new easement area, we considered a number of factors including, but not limited to, present use of the easement area, future use of the easement area, building and zoning restrictions, access considerations, market perception as reported by participants, and the remaining use and utility of the property within the easement area."

During his testimony Mr. Sell stated that he placed significant emphasis on the highest and best use, and whether the property owner could continue to utilize the property after the taking for its highest and best use. He also testified that while there are certain rights that a property owner loses when an easement is on their property, their biggest right is to be able to continue to farm the property. He concludes that there was no damage to the remainder of the property because the highest and best use does not change, Spire engages in restoration after the construction of the pipeline, there is no physical severance of the property, like a railroad line or other aboveground

---

[4] The Commission notes that the rental terms of the appraisers differed by one year.  Plaintiff's appraiser used a rental term of 3 years, and defendant's appraiser used a rental term of 2 years.  The Commission finds that the 2 year rental term is appropriate given that the date of the taking was December 17, 2018, and the letter from Spire to the landowner, releasing the right-of-way to the landowner, is dated April 30, 2020 (Plaintiff's Ex. 23.)

impediment, before the taking there was no prospect for future development of the property given its location in the flood zone and no improvements were impacted by the construction on the property or by the imposition of the easement on the property.  Therefore he concludes that there is no justification for damages to the remainder.

During cross-examination, in questioning relating to whether or not there was stigma damage because the subject property now has a pipeline on it, Mr. Sell stated that he does not place any negative effect from the existence of the pipeline, and he testified that in some cases farm properties with one or more pipelines sell for more than properties without pipelines on them. He concluded that the existence of a pipeline does not have an effect on the value of farms or their remainder value in St. Charles County. He stated that the market for agricultural ground in St. Charles County does not care about pipelines. He stated that he spoke to the St. Charles County assessor, brokers, other owners, and was told by those parties that pipelines do not matter with regard to agricultural property. He stated that in terms of being able to farm the ground, a pipeline does not matter. He stated that the market does not bear out the fact that stigma damage affects the sale of farm properties with pipelines on them in St. Charles County. He stated that as to safety issues with a pipeline, as an appraiser, they are looking at what the market bears out, and there has not been an effect on what the market will pay relating to the existence of a pipeline on farm property St. Charles County.

On cross-examination, Mr. Sell agreed that in theory, if the property has a pipeline on it, and another property does not have a pipeline, then the property with the pipeline is less valuable than the one that does not, because of the reduction in rights, but he concluded that the market may not bear that out.

11

Linda Atkinson Appraisal and Testimony. Ms. Atkinson testified as to four components in her appraisal report indicating a loss of value.  Those are the permanent easement of $24,000.00, the temporary easement of $14,000.00, the "loss in value" described below of $134,000.00, and the "additional loss in value" of $357,000.00. The total of these four components is $529,000.00.

Ms. Atkinson concluded in her appraisal report that the subject property suffered loss of value, in addition to the before and after value of the permanent easement and the temporary easements. She categorize this in her report as "loss of value" and "additional loss of value".

With regard to "loss of value", she stated in her testimony that she assigned a loss of value for "stigma damage", and for loss of the bundle of rights relating to the easement. This portion of her testimony did not relate to damage to the property. She stated that stigma damage results from a perception that there is a defect in the property if a pipeline exists on the property. Among other resources, her report relies on a 2020 report titled *The Impact of a Natural Gas Pipeline on Property Values*, performed by the Forensic Appraisal Group. This report is referred to herein as the "Forensic Appraisal Study".  In her report she states that the Forensic Appraisal Study used empirical evidence to compute value loss by comparing sales of properties that were impacted by a natural gas transmission pipeline to comparable property sales that were not encumbered by a pipeline. The study measured the impact on value of the presence of a pipeline. The study found that the overall impact ranged from about +2% change in value to -32% change in value, with the averages ranging from -13% to -18%.  Ms. Atkinson contacted the author of the study.  She also spoke to other professionals in the St. Charles County area to obtain their professional opinions as to the effect of pipelines on the sale price of farm land in St. Charles County.  These included Tom Shaw of Tom Shaw Realtors and Dan Kluesner of Shockley Realtors.  Dan Kluesner advised her that pipelines could have a large impact if development could occur on the property, but not a large

impact on farm property which could not be developed.  Ms. Atkinson also spoke to Jason Cleveland, who is with Trophy Properties.  She testified that Mr. Cleveland told her that pipelines on farm properties caused a reduction of about $200.00 per acre in the sale price of farm property in St. Charles County.

In her testimony, she stated that she applied an 11% loss of value to the remainder of the property, which consists of approximately 120.94 acres after the permanent easement area is subtracted. Therefore, she concluded that her before value of $10,100.00 per acre was reduced by 11%, which brought it down to $9,000.00 per acre, after rounding. This resulted in a reduction in value of approximately $134,000.00 to the remainder. This is the "loss in value" component referred to in her report. During cross-examination, Atkinson testified that she did not find enough comparable sale data to conduct a paired sale analysis of farm properties in the area of the subject property with a pipeline and without a pipeline. She stated that she did not use the Kevin Machens property, because she determined that the purchaser of that property was a motivated buyer. She did admit in cross-examination that she could have adjusted for that factor in her report.

The Commission acknowledges the previous court decisions cited above as support for the premise that if fear of a hazard would affect the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller, diminution in value caused by that fear may be recoverable as just compensation. However, severance damages based wholly on speculation and conjecture are precluded.  In this case, Ms. Atkinson's opinion is not based on speculation or conjecture.  She did rely on substantial information in forming her opinion.  She spoke to many people about the issue, and spoke to the author of the Forensic Appraisal Study.  For the reasons described below, the Commission does not believe the value gap is 11%, as Ms. Atkinson concludes in her report, but despite this, the Commission finds that Ms. Atkinson had a rational basis for her expert opinion.

The Commission finds that while wide price disparities from stigma damage may certainly have been present in those paired sale comparisons described in the Forensic Appraisal Study, the comparable sale evidence presented at the hearing in the present case demonstrates a much smaller gap in prices, and much less stigma damage from the existence of pipelines on farm property sales in St. Charles County.  While the number of comparable sale with pipelines to compare to those without pipelines is admittedly small, they are still useful. At the hearing, evidence was presented about four comparable farm sales, all in close proximity to the subject property, and all four containing at least one pipeline. In each case, the sale price was significantly higher than the $9,000.00 per acre value placed on the subject property by Ms. Atkinson due to the existence of the STL Pipeline after the taking. The four comparable sales are as follows:

### Comparable Sales with Pipelines on the Property

| Description | Size | Tillable | Easements | $ Per Acre |
|---|---|---|---|---|
| Ray and Gary Machens<br>Sale Date 7-5-16 | 76.33 | 94% | 1 ammon.<br>1 gas | $10,136.00 |
| Kevin and Shelly Machens<br>Sale Date 2-2-16 | 56.75 | 92% | 2 OPL[5]<br>2 gas | $9,845.00 |
| Scott Smalley<br>Sale Date 2-2-16 | 22.99 | 94% | 1OPL<br>1 gas | $10,922.00 |
| J. and Lesa Keevan<br>Sale Date 1-2020 | 83.00 | UK | 1 gas | $16,116.00 |

It is also important to note that Ms. Atkinson's testimony regarding the diminution in value of the subject property, after the installation of the pipeline, which reduced its value to $9,000.00 per acre, is inconsistent with her testimony in the same hearing relating to the Kevin and Shelly Machens tract. In her testimony, and in her appraisal report of the Machens tract, she places a pre-

---

[5] "OPL" is the abbreviation for overhead powerline.

taking value on the property of $9,900.00 per acre. (Defendant's Ex. AA., Bates Pg. Machens Trial 000083.)   As noted above, that parcel is encumbered by two overhead powerline easements and two gas easements, which existed before the taking in this case, and which existed at the time of her pre-taking opinion of value. The Commission was not persuaded by her testimony that the value of the Poggemoeller tract was reduced to $9,000.00 due to the existence of one pipeline, the Spire pipeline, but the Machens tract was worth $9,900.00 before the taking, with two gas pipelines previously existing on the property.

Despite these facts, the Commission finds that due to the mere existence of the pipeline, located in the center of the property, and the loss of some of the "bundle of rights" over the permanent easement, and the other factors identified in footnote 6 below, there is some loss of value.  The Commission found the testimony of Ms. Atkinson about her conversation with broker Jason Cleveland to be reasonably informative and to be persuasive that the effect on the sale price of farms in St. Charles County are affected by about $200.00 per acre.   The Commission unanimously agreed that a reduction of $200.00 per acre to the remainder of 120.94 acres is fair, adequate and just compensation for the effect of the pipeline on the property, the loss of the bundle of rights over the permanent easement and the other factors identified in footnote 6 below. Accordingly, the Commission finds that defendants should be compensated in the amount of $24,288.00 for this component of "loss of value".[6]

---

[6] In reaching this conclusion, the Commission applied numerous factors which affect market condition, which are generally accepted appraisal practices and which are permitted considerations in determining fair market value as defined by 523.001(1) RSMo, including location of the easement across the property, total easement size as a proportion of total parcel size, whether the easement runs through the center of the property or is on the perimeter, or cuts the corner of the property, and the fact that potential buyers understand that a permanent easement takes away some part of complete dominion and control of the easement area from the owner of the property and Spire will have an ongoing right to enter the property should repairs need to be made, and finally, as noted above, any stigma associated with the easement. In this case, the location of the easement in the center of the property was given weight as a factor detracting from value, but the ratio of total easement area to total tract area (2.12%) is considered low, and was not given weight as a factor detracting from value.

With regard to "additional loss in value", Ms. Atkinson testified that she relied on Dr. Rao's cost to cure estimate contained in his report. Ms. Atkinson did not offer an opinion on the cost to cure estimates contained in Dr. Rao's report.  She came up with an additional loss of value amount of $357,000.00. This additional loss of value component is therefore addressed separately in Section V of this report.

## V.      COST TO CURE DAMAGES

Dr. Rao testified about five general categories of damage to the property arising out of the construction of the pipeline: (i) topsoil preservation and loss; (ii) uneven surfaces with major depressions and drainage issues; (iii) "shoddy" cleanup after construction; (iv) soil compaction; and (v) change of soil profile in the right-of-way. The Commission has addressed each of these areas of alleged damages.

A.      Topsoil Preservation-Loss.   In this case, defendants claim damages and loss of value totaling approximately $529,000.00, as shown in the summary of value conclusions in Linda Atkinson's appraisal report. (Defendants Ex. Y.)  Approximately $357,000.00 of this amount, or approximately 67.5%, is ascribed to "Additional Loss in Value" The great majority of this amount is allocated for the purpose of adding topsoil to the right-of-way or adding encapsulated worm cocoons to the right-of-way to build topsoil. For this reason, the Commission spent considerable time analyzing this issue.

At the hearing, Alan Poggemoeller testified that the right-of-way is 6 inches to 10 inches lower than the rest of the parcel. He testified that water in the right-of-way still takes a couple of days to drain, whereas before construction, drainage was not an issue. He offered into evidence photos, including photos 000014, 000015, 000016 and 000017. (Defendant's Ex. H.)  In photo 000016, he identified a ponding area, which he estimated would be the approximate size of the

16

courtroom in which he was sitting at the time of his testimony. He indicated that the ponding area was approximately 3 inches to 4 inches in depth. He testified that normal farming of the right-of-way and the remediation efforts that he has already completed have helped the right-of-way, but that work still needs to be done and soil needs to be hauled in, because there are holes and low spots in the right-of-way. He stated that he had not obtained a formal bid for adding soil to the right-of-way, but said that it would be somewhere around $200,000.00 based on his discussions with people who "move dirt all the time". He says that the right-of-way needs about 6 inches of topsoil on average throughout the entire right-of-way; some areas more and some areas less.

On cross-examination, Mr. Poggemoeller agreed the topsoil was spread back over the easement area and that no topsoil had just disappeared. He also agreed that the person he spoke to about a bid for topsoil did not do any actual measurements.

Jay Olsen testified that he was the liaison between plaintiff and defendant. Mr. Olsen said he would communicate with defendant and then record notes from his communications into his computer. The Agent Acquisition Log containing these notes was received and evidence. (Plaintiffs Ex. 40.) Mr. Olson's testimony, and the Agent Acquisition Log containing his notes together show that the defendant was not pleased with how the reclaimed right-of-way looked and that there were some low spots that could collect water and the right-of-way was wavy. The notes also identify the existence of debris in the right-of-way or on the defendants' property after construction had been completed. It is also clear from Mr. Olsen's testimony that while he and Mr. Poggemoeller did speak about low spots and holes in the property, those issues were never resolved because the contractor, Michaels, pulled out in the fall and it was too wet to correct the problems at that time. In July, Mr. Olsen's services were no longer needed, and the communications between plaintiff and defendants essentially ceased at that time.

17

The construction and restoration standards which apply to the segregation and replacement of topsoil are generally as follows:

**From the Environmental Assessment**

**8.1 General Pipeline Construction Procedures**

In agricultural areas, Spire would segregate topsoil across the entire right-of-way, including HDD pull string areas.  The full depth of topsoil, up to 12 inches in Missouri and 36 inches in Illinois per the Project's AIMA, would be segregated and stored separately from subsoil.  Temporary soil erosion and sediment control devices would be installed as needed in accordance with the Plan and Procedures.  The erosion and sediment controls would be inspected and maintained throughout construction and restoration of the Project.  Following clearing, the construction right-of-way and ATWS areas would be graded where necessary to provide a level work surface.

(Plaintiff's Ex. 2, Bates Pg. Spire 005142.)

[Remainder of this page left blank.]

18

**8.2 Special Pipeline Construction Procedures**

**Agricultural Areas**

Construction in agricultural areas would be conducted in a manner similar to conventional pipeline construction; however, Spire would protect the topsoil from the movement of equipment and construction activities through removal of topsoil.  Spire would store segregated topsoil and subsoil in separate windrows.  Spire would use a construction right-of-way up to 115 feet wide in agricultural areas to allow for topsoil stockpiling.  During backfill operations, subsoil would be used to initially backfill the trench, and then the topsoil would be reapplied to the top of the trench and the graded right-of-way.

Spire consulted with the Missouri Department of Agriculture on the need for an AIMA and any special construction techniques the state may require.  Missouri does not require an AIMA, therefore construction and restoration on agricultural land in Missouri would be done in accordance with the Plan.  Mitigation measures include requirements regarding minimum depth of pipeline cover, topsoil segregation, and post-construction monitoring and revegetation.  Topsoil would be segregated to the full depth, up to 12 inches, and stored separately from subsoil.

(Plaintiff's Ex. 2, Bates Pg. Spire 005148.)

[Remainder of this page left blank.]

19

**From the Upland Erosion Control, Revegetation, and Maintenance Plan**

B.    TOPSOIL SEGREGATION

1.    Unless the landowner or land management agency specifically approves otherwise, prevent the mixing of topsoil with subsoil by stripping topsoil from either the full work area or from the trench and subsoil storage area (ditch plus spoil side method) in:

    a.    cultivated or rotated croplands, and managed pastures;

    b.    residential areas;

    c.    hayfields; and

    d.    other areas at the landowner's or land managing agency's request.

2.    In residential areas, importation of topsoil is an acceptable alternative to topsoil segregation.

3.    Where topsoil segregation is required, the project sponsor must:

    a.    segregate at least 12 inches of topsoil in deep soils (more than 12 inches of topsoil); and

    b.    make every effort to segregate the entire topsoil layer in soils with less than 12 inches of topsoil.

4.    Maintain separation of salvaged topsoil and subsoil throughout all construction activities.

5.    Segregated topsoil may not be used for padding the pipe, constructing temporary slope breakers or trench plugs, improving or maintaining roads, or as a fill material.

6.    Stabilize topsoil piles and minimize loss due to wind and water erosion with use of sediment barriers, mulch, temporary seeding, tackifiers, or functional equivalents, where necessary.

(Plaintiff's Ex. 3, Bates Pg. Spire 005592.)

Dr. Rao testified that he believed topsoil was not preserved and the trench was not backfilled properly. In his report he states: "By observing the field contour of the right-of-way after construction, it is evident that the topsoil was not preserved, and the trench was not backfilled properly. Since construction continued during and after heavy rain events, it is possible that some of the segregated topsoil was lost due to runoff. It is very hard to quantify how much was lost or place a dollar figure on it. Additional topsoil measuring off right-of-way will help to determine the potential on right-of-way loss of topsoil." (Defendants Ex. K.)

Plaintiff's rebuttal expert, Aaron DeJoia, testified that defendants have presented no data to establish the topsoil was lost during construction. He points out that Dr. Rao never measured the topsoil depths or quantified the amount of topsoil loss in his report.  DeJoia includes in his report topsoil measurements taken by plaintiff prior to construction.  Those are shown in Table 1 of the report. (Plaintiff's Ex. 25.) While these measurements are somewhat helpful, post-construction topsoil measurements were not provided, so the Commission is not able to make a direct comparison.

The Commission is able to conclude, however, that plaintiff adhered to the topsoil segregation and preservation requirements described above. This is best illustrated by the 2019 flyover videos taken from a helicopter, and offered into evidence by plaintiff during the testimony of Russell English. (Plaintiff's Ex. 37.)  Specifically, the flyover videos from March 18 and April 1, 2019 clearly show the topsoil windrows piled along the trench, and separated from the subsoil dug out of the trench. The April 29, 2019 flyover video shows vegetation beginning to grow on the topsoil windrows. The May 29, 2019 flyover video shows healthy vegetation growth on the windrows. The June 10, 2019 flyover video shows the flood water beginning to inundate the field, but you can still see the existence of the windrows and the vegetation growing on them. In the June

21

24, 2019 flyover video, the windrows are still present, and there is still vegetation growing on most areas of the windrows. As a result of this being a very flat parcel of property, it is clear that, even during and after the flood that occurred in June 2019, the topsoil was not carried away or washed away by water currents or water flow. Finally, the flyover video of September 30, 2019 clearly shows the topsoil after it was replaced over the right-of-way area, and it is dark in color and appears to be evenly spread. Based upon these video images, and the testimony of Russell English, the Commission finds that plaintiff did adhere to the topsoil segregation and preservation requirements referred to above.

The Commission Instructions, Section S, places the burden of proof on the defendant. Under Missouri law, the defendant landowner has the burden of proving by the greater weight of the evidence the amount of damages to which the landowner is entitled. Therefore, the landowner has the burden of causing the Commission to believe that a respective proposition is more likely true than not true. With regard to the claim that the topsoil in the entire right-of-way is 6 inches to 10 inches lower than the rest of the parcel, the Commission is not persuaded that this is true, and therefore the Commission does not recommend an award of damages for loss of topsoil over the entire right-of-way.

B.    Uneven Surfaces with Major Depressions and Drainage Issues.

The Commission observed obvious low spots and holes in defendants' property. The existence of uneven surfaces, major depressions and drainage issues are easily visible in the flyover videos taken by helicopter and offered into evidence by plaintiff. (Plaintiff's Ex. 37.) Perhaps the best illustration of this during wet conditions is the flyover video taken on December 1, 2019. This video shows numerous low spots, holes, and wet areas.  Further, these same low spots, holes and wet areas are particularly notable in the flyover video from July 6, 2021.  (Plaintiff's Ex. 39.)  In

22

this video, it is clear that some of the low spots, holes and wet areas are severe enough to prevent crop growth altogether. The Commission also finds that, given the amount of time that has passed between the completion of construction and the flyover video taken on July 6, 2021, the existence of damage to defendant's property, in the form of low spots, uneven surfaces with major depressions and drainage issues is ascertainable and can be reasonably quantified at this time.

After reviewing all of the flyover videos and photographs of defendant's property, the Commission concludes there are at least four large to medium size low spots, holes and depressions and three smaller low spots, holes and depressions on the property which affect the growth of crops, farming operations, drainage and planting patterns.  The Commission recommends that defendants be awarded compensation to correct these issues.

Based upon the testimony of Dr. Rao, one truckload of topsoil is equal to 12 cubic yards. He states in his report that 449 truckloads of topsoil will cover 6.68 acres at a depth of 6 inches. (Defendants' Ex. K.)  According to this calculation, it would require 806.58 cubic yards of topsoil to cover 1 acre at a depth of 6 inches.

The Commission concludes that the uneven surfaces, holes, major depressions and low spots affect approximately 1.25 acres of the total right-of-way area of 6.68 acres. The Commission also concludes that to fill these at a depth of 6 inches will require 1,008.25 cubic yards of topsoil. According to the testimony of Aaron DeJoia, the cost and selection of topsoil for this purpose can be obtained from Arnold's Custom Seeding for the approximate amount of $28.00 per cubic yard, delivered. (Plaintiff's Ex. 25.)  Therefore, the Commission recommends that plaintiff be ordered to pay to defendant the sum of **$28,231.00** as and for the cost of 1,008.25 cubic yards of topsoil with delivery included in this price.

Pursuant to the Plan, Section V (5), during restoration plaintiff is required to grade the construction right-of-way to restore pre-construction contours and leave the soil in proper condition for planting. Alan Poggemoeller testified about significant drainage problems, some of which related to ditches being blocked, which was later corrected by plaintiff. However, other drainage issues have persisted. Further, Mark Poggemoeller testified that to reduce the drainage and ponding issues on the property, it would be necessary to utilize a bulldozer with a GPS system to read the low spots and then import soil to those areas that cannot be made level during the grading process. The Commission concludes that the right-of-way area will need to be re-graded to restore pre-construction contours.  Therefore, the Commission recommends that defendant be awarded sum of **$1,800.00** to pay for the cost of regrading the right-of-way area to original contours. This calculation is made based upon a rate of $225.00 per hour for eight hours of services, using a GPS on a bulldozer with operator.  This award is to cover the cost of the use of the equipment and the cost of the operator of the equipment.

    C.    <u>Shoddy Cleanup After Construction</u>.

Defendant seeks damages for shoddy post construction cleanup after in the amount of $544.50.  In the Agent Acquisition Log notes of Jay Olsen, there are numerous references to mats, skids and other junk that Michael's left on the property. (Plaintiff's Exhibit 40.) The Commission concludes that the Agent Acquisition Log notes corroborate the testimony of Alan Poggemoeller that junk, debris, mats, and skids were left on or about the right-of-way area or the property generally, and therefore the Commission concludes that the award of $544.50 is reasonable. The Commission recommends that plaintiff pay to defendant the sum of **$544.50** for cleanup expenses.

D.    Soil Compaction.

Defendant seeks compensation to ameliorate soil compaction in the right-of-way. This includes wheat straw mulch and pellet injections, and planting of cover crops. Dr. Rao testified soil compaction was present, and that soil penetrometer and bulk density studies indicate significant compaction and loss in pore space.

In rebuttal, Aaron DeJoia asserted that the bulk density data presented by Dr. Rao was obtained from the top 3 inches of the soil profile, which has been tilled prior to planting the crop, and that characteristics of soil near the surface are sensitive to land management techniques and are not reflective of the greater soil profile. Additionally, he testified that the bulk density data collected by Dr. Rao does not indicate that root growth will be negatively impacted, and that soil strength measurements obtained by the Environmental Inspector for plaintiff indicate that dense layers were greater than 17 inches below the surface.  (Plaintiff's Ex. 25)

Soil compaction mitigation is covered by the Plan which states:

C.    SOIL COMPACTION MITIGATION

1.    Test topsoil and subsoil for compaction at regular intervals in agricultural and residential areas disturbed by construction activities.  Conduct tests on the same soil type under similar moisture conditions in undisturbed areas to approximate preconstruction conditions.  Use penetrometers or other appropriate devices to conduct tests.

2.    Plow severely compacted agricultural areas with a paraplow or other deep tillage implement.  In areas where topsoil has been segregated, plow the subsoil before replacing the segregated topsoil.

If subsequent construction and cleanup activities result in further compaction, conduct additional tilling.

3.    Perform appropriate soil compaction mitigation in severely compacted residential areas.

(Plaintiff's Ex. 3, Bates Pg. Spire 005598 and 005599.)

Mr. DeJoia's report includes the Decompaction Report which describes the decompaction procedures that were undertaken on the right-of-way on or about September 25, 2019. This report shows that subsoils were ripped with a deep tillage implement (rake attachment on track hoe) and the subsoil was left open for a day to dry in the sunlight before being graded with the dozer. It is the opinion of the Environmental Inspector that decompaction was successful. The decompaction readings contained in the report support this conclusion. Additionally, photographs are included with the report illustrating the decompaction procedures being undertaken, and the subgrade after ripping, left open for it to dry.  Finally, the report includes a pictures of the penetrometer readings being taken on the property.

The Commission concludes that plaintiff followed the decompaction requirements of the Plan, and that decompaction was successful. For these reasons, the Commission does not recommend an award of compensation to defendant for compaction of the soil in the right of way.

    E.    <u>Change of Soil Profile in the Right-of-Way</u>.

Dr. Rao concludes in his report that pipeline construction caused changes in the soil profile in the right of way. He concludes that soil particle composition, structure and appearance are different and changed for the worse. He further concludes that soil structure is cloddy and undesirable in the right-of-way, compared to a much more desirable granular like structure in the rest of the field and that the right-of-way is now susceptible to soil surface crusting. In terms of how to correct this, he states that it is hard to correct, but that the previously discussed amelioration of adding topsoil, worms and cover crops should help over time.  (Defendants' Ex. K.)

Aaron DeJoia states in his report there is no agronomic difference in the soil texture between the on right-of-way and off right-of-way soil based upon the data provided by defendant, that the soil structure is expected, based upon pipeline construction and topsoil handling

techniques, and the soil structure will improve as crops are grown. He also indicates that soil texture on right-of-way will not negatively impact crop productivity, and that soil structure will not negatively impact crop productivity once normal farming practices are used.  (Plaintiff's Ex. 25.).

Under the Plan, restoration shall be considered successful if the right-of-way surface condition is similar to adjacent undisturbed lands, construction debris is removed, revegetation is successful, and proper drainage has been restored.  In agricultural areas, revegetation shall be considered successful when upon visual survey, crop growth and vigor are similar to adjacent undisturbed portions of the same field. (Plaintiff's Ex. 3, Bates Pg. Spire 005601.)

The Commission finds that the right-of-way surface condition is similar to adjacent undisturbed lands (except for those areas with low spots, holes and depressions, which are addressed above).  Further, the Commission believes the crop growth and vigor, judged by visual survey by the Commission in the flyover videos, is similar to adjacent undisturbed portions of the same field.  Drainage and grading issues have also been address in this report.  Therefore, the Commission finds that changes in the soil profile on the right-of-way described in Dr. Rao's report do not affect crop growth and vigor, appearance, drainage or revegetation.  The Commission does not recommend compensation to defendants for this claim of damages.

In sum, having weighed all of the evidence, the Commission determines that Spire owes to the defendants the amounts of compensation and damages set forth in the summary chart incorporated herein as **Exhibit A**. The Commission recommends the Court order Spire to pay the total compensation and damages to the defendants in these amounts.

All aspects of this decision are unanimous.

**RESPECTIVELY SUBMITTED,**

**For the Commission:**

*/s/ Thomas M. Lang*
Thomas M. Lang
Commission Chair

*/s/ Dave Rohlfing*
Dave Rohlfing
Member

*/s/ Edward Dinan*
Edward Dinan
Member

*/s/ John Matlick*
John Matlick
Member

*/s/ Timothy R. Huff*
Timothy R. Huff
Member

Dated September 2, 2021

## EXHIBIT A

**SUMMARY OF RECOMMENDATION OF COMPENSATION AND DAMAGES**

**(Alan Poggemoeller and Sharon Poggemoeller-Tract No. MO-SC 307.000)**

| DESCRIPTION | AMOUNT |
|---|---|
| Value of Permanent Pipeline Easement | $23,670.00 |
| Total Market Rent for Temporary Easements | $16,200.00 |
| Loss of Value to 120.94 Remainder | $24,188.00 |
| Topsoil to Fill Holes, Low Spots and Depressions | $28,231.00 |
| Cost of Regrading ROW Contours | $ 1,800.00 |
| Cleanup Costs | $   544.50 |
| **Total Just Compensation and Damages** | **$94,633.50** |